IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 4:24-CR-608-1 |
| | § | HOUSTON, TEXAS |
| VERSUS | § | THURSDAY, |
| | § | DECEMBER 12, 2024 |
| JOEY LAMAR ELLIS | § | 9:59 A.M. TO 12:30 P.M. |

**ARRAIGNMENT AND DETENTION HEARING**

BEFORE THE HONORABLE ANDREW EDISON
UNITED STATES MAGISTRATE JUDGE
(APPEARING VIA ZOOM)

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| ELECTRONIC RECORDING OFFICER: | HOPE MCFARLIN |
| COURTROOM CLERK: | RUBEN CASTRO |

**THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY COURT ORDER. UNAUTHORIZED REPRODUCTION WILL RESULT IN AN ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE COPY AT THE OFFICIAL RATE. General Order 94-15, United States Court, Southern District of Texas.**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES**:

FOR THE USA:

Rebekah Lynn Saunders, Esq.
U.S. Department of Justice
U.S. Attorney's Office
Houston Division
1000 Louisiana St.
Suite 2300
Houston, TX 77002
713-567-9555

FOR THE DEFENDANT:

Darryl Emmanuel Austin, Esq.
717 Texas Avenue
Ste 1200
Houston, TX 77002
832-356-7192

## INDEX


| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| THEO WILLIAMS | | | | |
| By Mr. Saunders | 8 | . | 91 | . |
| By Mr. Austin | . | 65 | . | . |
| RODNEY ELLIS | | | | |
| By Proffer | 102 | . | . | . |

| EXHIBITS: | Received |
|---|---|
| GOVERNMENT'S: | |
| Exhibits 1, 2, 3 | 7 |
| Exhibit 4 | 7 |

| CLOSING ARGUMENTS: | |
|---|---|
| By Ms. Saunders | 103, 116 |
| By Mr. Austin | 113 |

| COURT'S RULING: | 124 |
|---|---|


***

**HOUSTON, TEXAS; THURSDAY, DECEMBER 12, 2024; 9:59 A.M.**

THE COURT: Okay. Good morning. This is the United States District Court for the Southern District of Texas. I'm Judge Andrew Edison presiding.

We're here today on case CR-608-001.

Can I get the introduction of the Counsel starting with the Government?

MS. SAUNDERS: Rebekah Saunders for United States. Good morning.

MR. AUSTIN: Good morning, Your Honor. Darryl Austin on behalf of Mr. Ellis, who is present in court to my left on the screen, I guess.

THE COURT: Hello. (Indiscernible) for the Government, I didn't hear anything.

MS. SAUNDERS: Good morning. Rebekah Saunders for United States.

THE COURT: Hello, Ms. Saunders, good to see you.

Excuse me. Hi, Ms. Saunders, you all should be very glad that I'm not there in person because whatever I have is completely contagious and thank you (indiscernible) that allows me to get the job done, but it does get you all sick. So thank you for that.

We're here today for two things. First, we have and Arraignment and then we have a Detention Hearing -- first of all, let me -- (indiscernible) we have both the

Arraignment and the Detention Hearing from the Government. Can we do that both by video here today?

MS. SAUNDERS: Yes, Your Honor.

THE COURT: And, Mr. Austin, can I get your agreement to do with both the Arraignment and the Detention Hearing by video and (indiscernible) agreement to waive the formal reading of charges. Can you confirm with me that you had an opportunity to review the charges set forth in the Indictment with your client and that he is prepared to enter a not guilty plea at this time?

MR. AUSTIN: Yes, Judge.

THE COURT: Okay. And, Mr. Ellis, let me ask you directly. Your attorney is indicating (glitch in the audio) is that case and are you prepared at the present time to enter a not guilty plea?

DEFENDANT ELLIS: Yes, sir.

THE COURT: A not guilty plea is so entered on your behalf in the papers of this case.

Ms. Saunders, how long do you expect the trial of this case to run?

MS. SAUNDERS: Approximately two to three weeks, Your Honor.

THE COURT: Okay. I'm going to enter a scheduling order that is going to set forth various deadlines that will control this case. This case has been assigned to United

States District Court (indiscernible). The trial will take place on January 27th, 2025 at 9:00 a.m. under the (indiscernible) before Judge Hanks and (indiscernible) on January the 17th at 10:00 a.m.

Any motions are going to be filed by December 23rd, any responses by December 31st, and as the lawyers are well aware, if your client changes, alterations, modifications or anything else to the schedule to brief that with Judge Hanks at the appropriate time, and I'm going to be signing that scheduling order, and that would be entered.

Okay. Let's turn to the Detention Hearing. Is the Government ready to proceed?

MS. SAUNDERS: Yes, Your Honor.

THE COURT: And, Mr. Austin, on behalf of the Defendant, are you ready to proceed?

MR. AUSTIN: Yes, Judge.

THE COURT: Okay. I have received three documents from -- I believe from Mr. Austin, entered into evidence here today. Is there any objection -- hopefully, you've had an opportunity to review those documents, Ms. Saunders?

MR. AUSTIN: Yes, no objection, Judge. For purposes of the Detention Hearing, there are no objections to the Government's three exhibits.

MS. SAUNDERS: Yes, Your Honor. They're the exhibits from the Government.

THE COURT: Oh, wait a second.

(No audible response)

THE COURT: I'm sorry. I said Defendant's exhibit. Government's Exhibit. Government's Exhibits 1, 2, and 3 are admitted.

(Government's Exhibits 1, 2 and 3 received in evidence)

THE COURT: I'm also going to *sua sponte* admit -- I'm going to make it Government's Exhibit 4, just because it's easy.

(Government's Exhibits 4 received in evidence)

THE COURT: The pre-trial report, which has been submitted to me, I have reviewed, and those are the four exhibits at least at this time unless Mr. Austin has exhibits that he would like to introduce.

As you all know, the way I like to do the Detention Hearing is have a proffer from the Government. Who would your witness be, Ms. Saunders?

MR. AUSTIN: Judge, I can't -- normally, I wouldn't mind, but considering the nature of the case, a proffer is just going to be a little too hard for me to -- I think hearing it at once. I don't have a copy of the proffer. I've not read it. I would prefer they do some kind of Q&A even if it is from the proffer, just so I can follow along.

THE COURT: I don't have a problem with that, do

you, Ms. Saunders?

MS. SAUNDERS: Not at all.

THE COURT: Okay. Then tell me who is your witness.

MS. SAUNDERS: Special Agent Theo Williams.

THE COURT: Okay. Agent Williams, could you do me a favor? Would you raise your right hand, sir?

(Witness complies.)

THE COURT: Do you swear the testimony you're going to give in this court proceeding today is the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, sir.

(Witness sworn.)

THE COURT: Okay. You may proceed.

MS. SAUNDERS: Thank you, Your Honor.

And we're sharing a microphone. So, if you need either one of us to repeat our questions, just wave or something so we can do that.

THE COURT: Sounds good.

MS. SAUNDERS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SAUNDERS:

Q Agent Williams, will you please introduce yourself and tell the Court a little bit about your background?

A My name is Special Agent Williams. I've been with the

FBI a little bit over 15-and-a-half years. Started off in the El Paso Division working gangs and drugs. Came to Houston where I worked Crimes against Children for a long time.

I'm with the FBI headquarters as a supervisor in the Crimes against Children Unit. I went down to The U.S. Virgin Islands as a supervisor, and now I'm back here in Houston working civil rights where I cover, color of law and hate crimes.

Q And how long have you worked in that capacity?

A I've worked in this current capacity for a little over two years.

Q And you're investigating the -- participating in the investigation of this current case against the Defendant, Joey Ellis?

A Correct.

Q Are you the lead agent assigned to this case?

A I am not.

Q Who is the lead agent?

A Special Agent Shana Daniels.

Q And have you at least been involved and familiar with the nature of the investigation?

A Yes.

Q But you're just not the lead agent who has investigated all the ins and outs of it?

A Correct.
Q Okay. And so, have you reviewed reports and evidence in preparation for your hearing today?
A Yes, I have.
Q But you weren't the one who necessarily created those documents?
A Correct.
Q And can you tell the Court a little bit about the Defendant's background?
A Where was he employed when he was arrested by Houston Police Department?
A The Defendant was employed with the City of Houston as a Urban Park Ranger.
Q And can you describe some of the job duties of what an Urban Park Ranger would do?
A Some of the duties that they're responsible for, park attendant safety, responding to alarms and buildings that scatter the parks throughout the City of Houston, traffic control, and things like that.
Q And are Park Rangers sworn law enforcement officers?
A No, they're not.
Q Do they have the authority to arrest people?
A No, they don't.
Q Do they have the authority to charge people with crimes?

A No, they do not.
Q And so, what would happen if a Park Ranger encountered someone in the park that's breaking the law? Maybe they're trespassing or there's a noise complaint or there's a vandalism, what would a Park Ranger do if they encountered someone doing that?
A Initially, they would try to de-escalate that issue themselves, ask the patrons to leave if the park is closed or turn down the music. If that patron refused to do so, they would call dispatch and ask for dispatch to call a police unit.
Q And that police unit would come from which law enforcement agency?
A Houston Police Department.
Q And so, at that time, would a certified Peace Officer for the State of Texas respond to the park to address any sort of criminal activity or situation?
A Yes.
Q And would the Park Ranger be involved in that at that point?
A No.
Q While a Park Ranger is on duty, can you describe what their uniform looks like?
A They would typically wear some BDU or 5.11 style cargo pants, button up shirt with City of Houston insignia or

patches on there. They also had -- issued a badge that they could wear and a flashlight and a radio.
Q And while they're on duty, what type of vehicle would they drive?
A They would drive a City of Houston vehicle. That vehicle would have the City of Houston insignias or logos on the side.
Q And so, if you were a layperson, would it be easy to confuse a Park Ranger possibly with an actual certified Peace Officer?
A It would -- it would be possible. Those vehicles also have lights on the top as well. I forgot to mention.
Q And what is the policy regarding Park Rangers having and possessing firearms while on duty?
A Per their policy, they are not allowed to possess or carry any form of firearm.
Q And the Defendant in this particular case, what shift did he work while as a Parks and Recreation officer?
A Approximately 10:00 p.m. to 6:30 a.m. shift.
Q So, an overnight shift?
A Yes.
Q Now, can you -- let's just kind of go generally over the investigation and how this scheme worked. Would you say in general, there was a kind of a common plan that occurred by this Defendant when he contacted people at the park?

A Yes.
Q So, let's just go in general over it, although, our Indictment has 20 counts. Is that correct?
A Correct.
Q And at this point, eight victims listed in that Indictment?
A Correct.
Q So, let's just talk generally what happened during the investigation. What types of crimes were being committed by this particular Defendant?
A Robbery, sexual assault crimes, crimes with a weapon, and assault.
Q And to be clear, is this investigation still ongoing?
A Yes.
Q And do there continue to be victims that are trying to be reached out to encountered by the FBI?
A Yes.
Q And that was before and the time frame that's even listed in the Indictment for the current victims?
A Yes.
Q What was the time frame that these crimes occurred as indicted at this point?
A Approximately from January of 2024 to up to June, something like that.
Q So, now let's talk about the pattern of activities that

occurred. Can you give us an overview of what that plan was and what the Defendant would engage in his conduct?

A The Defendant would approach a patron in the park, insist that they were in the park for sex, and would start to extort them for money and threaten to tow their vehicles and/or asked for sex in exchange for the situation going away.

Q Okay. So, let's break it down a little bit. Was the Defendant working as a Parks and Rec officer on duty when these interactions would take place?

A Yes.

Q On the overnight shift?

A Yes.

Q Was he wearing his Parks and Rec uniform?

A Yes, he was.

Q Was he driving that city vehicle you described?

A Yes.

Q Which park did these interactions most commonly occur in?

A A park called Cullen Park.

Q But did any of these interactions occur in other city parks?

A Yes, they did.

Q And did this Defendant possess a firearm in any of those interactions?

A Yes, he did.
Q And so, you said he would stop and detain victims who were using the park. Were they using the park at night then?
A Yes, they were.
Q How would he stop and detain people?
A Primarily, he would pull his city vehicle up and block in their vehicles to where they couldn't leave, and then he would go up to their vehicle and ask for their identification to take it or ask them to exit the vehicle and take their identification.
Q So, would he block their vehicle in a way where you said their vehicle could not leave the park?
A Correct.
Q Would he activate the lights that were on his city vehicle?
A Yes, he would act activate the light bar on top of his vehicle.
Q And in general, would these victims feel that they were at liberty to leave?
A No. They have -- no one felt -- everyone felt as if he was an authority and a Peace Officer, and they did not feel like they were free to leave.
Q Now, in actuality, did the Defendant have the authority to do things in his jobs through Parks and Recreation?

A No, he did not have that authority.
Q Once he made contact with these individuals, how would he identify who they were?
A He would -- one, he would pull up an app or a website called Sniffies and see --
MR. AUSTIN: What was it?
THE WITNESS: Sniffies.
MR. AUSTIN: Sniffies. Thank you.
THE WITNESS: Sniffies. Yes.
BY MS. SAUNDERS:
Q And could you describe before we go further just what is this app that you said is called Sniffies? What is that?
A Sniffies is a web application where gay men buy or curious men will go on, and it's a -- what's the word I'm looking for? It's a web tracker where they can identify locations. It's a location-based service, and they could see each other's location, and they would talk and communicate through chat, and they would agree to meet up at places.
Q And so, when you're utilizing the Sniffies app, can you see other Sniffies users that are in a general proximity to your location?
A Yes.
Q Okay. And so, you say that he would contact people who were using the Sniffies app. Was this -- did this come out

for the investigation that this is what victims would describe?
A Yes.
Q Okay. And what sorts of questions did they say would he ask regarding the Sniffies app?
A He would ask whether they're there to have sex with men in -- men in the park. And -- yeah. So, he was pretty much saying that they're at the park illegally to have sex in the park, and that's a felony to do so.
Q Okay. And were the eight individuals listed in the Indictment, what are their genders?
A They're all male.
Q Okay. Now, when he would also make contact with these people, how would he try to verify or find out the identities of the people he was making contact with?
A He would ask for their driver's license or State issued ID.
Q And what would he -- well, would the victims give him their IDs?
A Yes, they would.
Q And what would he do with that?
A He would either take a photo or video, or he would use his walkie talkie or cell phone and call out their identification through that method to someone that no one knows who that was.

Q And so, victims would describe him actually photographing or videoing their driver's license?
A Correct.
Q Okay. And you said that he mentioned that he would tell the victims that they were committing a felony?
A Correct.
Q Did he tell them what would happen to them?
A He told them that they would go to jail and their -- and their car would be impounded, and they'd have to pay hefty fines.
Q And to be clear, are any of those accusations true?
A No.
Q They weren't committing felonies?
A No.
Q Okay. And what would happen if a person did have their car there? How would their car actually get towed?
A How would their car get --
Q Yeah. Did the Defendant have the authority to tow a person's vehicle?
A If a car was there, they would issue a ticket. They would put a ticket on the car, and there's a series of events before that car can be towed. So, he did not have authority to immediately tow a car.
Q And did he have the authority to tow a car that was occupied by a person?

A No.
Q Are we talking more about towing vehicles that have been abandoned?
A Vehicles that have been abandoned, yes.
Q But during this investigation, were all of the cars that were there and being blocked in by the Defendant's car, were those abandoned vehicles?
A No, they were not.
Q And the drivers of those vehicles are present with them?
A Yes.
Q So, this Defendant did not have the authority to tow their vehicles?
A Correct.
Q Okay. Now, what did he say could happen in lieu of getting arrested, going to jail, their car being towed, felony charges? Did he say that there was an alternative?
A The alternative was to pay what he would call a drop tow fee or a sexual act.
Q And can you describe what the term has come to mean in your investigation of what a drop tow fee is?
A Throughout our investigation, a drop tow fee was pretty much a fee that he would charge an individual to actually leave -- get their identification back and leave the park.
Q And so, in these instances, would the victims end up

paying the Defendant some sort of monetary value?
A Most of them, but the ones who couldn't, they were forced to do the sex act.
Q Okay. Otherwise, they thought that they would be arrested or car towed?
A Correct.
Q Okay. And how would the victims pay the Defendant?
A They would -- they've used payment applications such as Zelle and Cash App. Victims have been forced to go to the ATM and withdraw money as well, and cash on hand.
Q And in of these instances where the victims ordered to call family or friends to try to collect some cash for payment?
A Yes.
Q Okay. In any instance, did any friends actually come to the park in order to assist getting payment?
A Yes.
Q Okay. And was the victim that was at the park that the friend came to assist, was he basically held by the Defendant until a friend could actually bring cash to release him?
A Yes, the victim was held until a friend showed up, and they had to pool together their money, and the victim was actually still held there so the friend can drive to the nearest ATM to withdraw money to bring back in cash to give

to Mr. Ellis.
Q And you said sometimes the Defendant physically assaulted victims?
A Yes.
Q And what would the Defendant do -- first of all, were there ever any instances that were described as the Defendant having or possessing a firearm?
A Yes.
Q And, again, this was against policy?
A Against policy.
Q What would victims describe he would do with his firearm?
A One instance, the subject threw himself inside the car and drag the -- dragged the victim out and pointed the gun at the victim's chest. Another instance, he used his firearm to point it at another victim to get compliance, and several other victims say he did not point the gun at him, but it was very present, and he would tap it to bring awareness that he had a firearm.
Q And did that create any sort of fear that the victim would describe?
A Yes.
Q And would that force them to feel like they needed to comply?
A Yes.

Q On at least one event, were victims -- was the victim ever forced to strip naked without their consent?
A Yes.
Q Did the Defendant ever physically touch in a sexual manner any of the victims?
A Yes.
Q How so?
A In one instance -- to one instance, the subject walked up to the victim and touched the victim's genitals outside of his clothes. This person was not made to strip, but he walked up and touched his genitals to see if he was there for sex.
Another instance, he made the victim completely get disrobed to prove he wasn't there. As the victim said, they are horny for sex, and he had to prove it and turn around and bend over. And another instance, he had a victim drop his pants, and he groped in -- he groped his buttocks in his chest and made that victim give him oral sex.
Q And on any occasions, did this Defendant instruct the victims not to tell anybody?
A Yes.
Q And is that reflected then in the obstruction of justice witness tampering charges in the Indictment?
A Yes.
Q On at least one event, did the Defendant ever chase a

vehicle or chase a victim's vehicle using his city issued vehicle?
A Yes, he did.
Q And is that against Parks and Rec policy?
A That is.
Q Did the Defendant ever have any victim try to lure other victims to the park?
A Yes, he did.
Q And we'll go into a little bit more detail about that later.
A Uh-huh.
Q But overall, that's just kind of the general scheme of what would happen when the Defendant would contact victims?
A Correct.
Q But it is still an ongoing investigation?
A Yes, it is.
Q Okay. And so, your testimony today is merely a summary of that?
A Correct.
Q Now, I know that we've admitted Government's Exhibits 1 through 4. I'm going to show you Government's Exhibit 2. Is that the uniform that you described that the Parks and Recreations officers would wear?
A Correct.
Q And who is this actually in Government's Exhibit 2?

A In Exhibit 2, that is a photo of Joey Ellis on the night he was arrested.

Q And we'll get more into detail about the night that he was arrested, but he is in handcuffs here and is that -- he was arrested by Houston Police Department?

A Correct.

Q Okay. And in Government's Exhibit 3, what is -- is this the vehicle that you described, the Parks and Rec?

A Correct. That's the city issued vehicle.

Q Okay. Now, Government's Exhibit 1 is a general timeline of summarizing the victims and the charges. Is that correct?

A Correct.

Q And so, we're not going to go through all of the victims in exact detail. I do want us to go over Victim 1.

A Uh-huh.

Q And so, on the chart here, before we start with Victim 1, let's just kind of get an overview. We've got different colored dots, and can you describe what the different colored dots mean in respect to each victim in the charge?

A Okay. On the -- the green dot is going to represent a victim that was robbed. The yellow dot would represent a victim that was a victim of sexual assault. The blue dot would be victims who were subject to, either being, the gun

was visible, the gun was present, and the red dot is going to represent victims who were assaulted.

Q And the chart goes chronologically, and you say it from about January 2024 through when his arrest occurred on or about June 10th or 11th, 2024?

A Correct.

Q So, let's start through with Victim 1.

A Uh-huh.

Q Can you describe in general what happened during Victim 1's interaction with the Defendant?

A So, Victim 1 was a homeless victim. He was in the park pretty much looking for somewhere safe to sleep that night, and Mr. Ellis approached his vehicle, and asked for his identification and got him out the vehicle, and that's when it started.

Q And so, you said that Victim 1 was homeless, but you said he had a vehicle. So, was he sleeping in his car?

A Sleeping in his car. Yes.

Q Okay. And did the Defendant confiscate Victim 1's driver's license?

A Yes, he did.

Q Did he communicate with Victim 1 any about using the Sniffies app?

A Yes, he did.

Q Did he ask him or threaten those same sorts of comments

that you described generally about him committing a felony or his car being towed?
A Yes.
Q Did the Defendant physically search Victim 1?
A Yes, he did.
Q And what was the purpose of searching him?
A The search was pretty much to try to determine if he was there for sex or horny, and he made him completely disrobe and take off his clothes.
Q And did the Defendant have a firearm in this incident?
A Yes, he did.
Q Did this cause the victim any sort of fear of the Defendant?
A Yes, it did.
Q And when the victim was forced to strip naked, what did he have to do?
A He had to turn around and bend over to show proof that he wasn't there for sex.
Q Was there any actual physical contact made?
A I'm drawing a blank on that one.
Q None that you can recall at this time?
A Not that I can recall at this time. Yeah.
Q Okay. And was this victim ordered to pay any sort of cash to the Defendant?
A Yes, he was.

Q How much cash?
A He asked him for $300, but the victim didn't have that type of money.
Q What did the victim have?
A The victim had -- I believe he had, like, a 100 and a 100 doll -- maybe $20 cash, and Mr. Ellis took his phone in and used the victim's Cash App or Zelle, and transferred a 100 bucks to himself.
Q And so, then is that reflected on the chart here where it says Victim 1 strip search and a $120?
A Correct.
Q Okay. And so part of that was cash, part was through Cash App?
A Yes.
Q And did the Defendant instruct the victim not to tell anybody about it?
A He did.
Q What did he say that that would be if he told anybody about what happened?
A He would get in more trouble if he told anyone about it.
Q Did the Defendant give some sort of impression to the victim that he was engaging in some undercover operation or sting?
A Yes, he did. He said he's doing an undercover

operation to stop men from having sex in the park.
Q And was that also a reason why he told the victim to not disclose anything?
A Yes.
Q Did the Defendant ask this victim to try to lure others to the park?
A Yes, he did.
Q What was the Defendant's instructions to the victim?
A He instructed him to get on the Sniffies app and lure additional victims to the park so that way he can do the same thing to them that he was doing to Victim 1.
Q And you said that in the Sniffies app you can communicate with other nearby users?
A Yes, you can.
Q And so, did Victim 1 comply with the Defendant's demands?
A Yes, he did.
Q And did other people end up coming to -- was this at Cullen Park?
A Cullen Park. Yes.
Q Did other victims end up coming to Cullen Park to meet up with Victim 1?
A Yes, they did.
Q And what happened when Victim 1 -- well, first of all, when the -- when Victim 1 was trying to get people to come

to the park, was he aware of where the Defendant was?
A He was.
Q Was he in eyesight of the Defendant, or where were their proximities or locations within -- in regards to each other?
A They were in close proximity, but they can see each other through the Sniffies app.
Q Could they see each other, like, eyeball to eyeball?
A No.
Q Okay. And so, the victim would communicate with other people to come to the park. Would the victim then make contact with those people when they arrived?
A Yes, he did. And he would tell them that there's somebody robbing people, and they should leave.
Q So, he would warn them to leave the park?
A Yes.
Q And why would the victim do this?
A He didn't want anyone else to get hurt.
Q And so, would those people who came to the park ultimately leave?
A They would leave.
Q Why would the victim then try to get the people to come to the park if he ultimately would tell them to leave?
A Out of fear, and he was instructed to do so by Mr. Ellis.

Q Was he trying to show Mr. Ellis that he was trying to comply?
A Yes.
Q But, ultimately, was he fearful of additional victims --
A Yes.
Q -- also being hurt?
A Yes.
Q Now, ultimately, we know that the Defendant was arrested that night. What did -- what initiated that arrest? What happened with the victim?
A Victim 1, he went to the woods and made his -- found a way to a gas station and dialed 9-1-1, and the operator told him to stay concealed and law enforcement would report to the park.
Q And so, was that Houston Police Department?
A Houston Police Department, yes.
Q Did they respond to the scene?
A Yes, they did.
Q And when they arrived, did they end up meeting up with the Defendant?
A Yes, they did.
Q Did they find anything on the Defendant's person?
A They found a gun, our victim's identification, and $20.
Q The $20 cash that the victim had described giving

him --
A Yes.
Q -- were found on the Defendant?
A Yes, it was.
Q And, again, the Defendant is not supposed to have a gun?
A He is not supposed to have a gun.
Q But HPD did, in fact, find one?
A Yes, they did.
Q And he was -- in Government's Exhibits 2 and 3, were those that -- that was the vehicle and the uniform he was wearing the night of his arrest?
A Correct.
Q And did this victim give a positive show of identification of the Defendant?
A Yes, he did.
Q And did law enforcement confirm the Cash App transaction of a $100 that was also transferred?
A Yes, they did.
Q And so, when the Defendant was arrested on that night, was he charged with any sort of crime?
A Official oppression.
Q And by what entity?
A By Houston Police Department.
Q Okay. And so, was that then the official oppression, a

State charge?
A That's a State charge. Yes.
Q And is that a misdemeanor?
A That's a misdemeanor. Yes.
Q So, he was charged with one misdemeanor for one victim that night?
A Yes, ma'am.
Q Okay. But, ultimately, this case obviously evolves into a bigger investigation. So, let's just describe -- we have on the outline here Victim 2, and we see the victim is outlined in a golden color?
A Yes.
Q From an early February date and, again, in April. Why is this victim on two spots on the timeline?
A Because he was victimized twice by Mr. Ellis.
Q Okay. So, let's go through that initial contact that we see on the chart, the earliest date in February.
A Uh-huh.
Q Can you describe just generally what happened during that occurrence?
A Because during that occurrence -- so, the victim was at Cullen Park where he would go three to five times a week to go for a run. And when he came -- when he was coming back to his car, Mr. Ellis had him blocked in.
Q Had him blocked in in his vehicle as well?

A In his -- yes. Yes. In his city vehicle. Yes.
Q And the Defendant have his lights -- vehicle lights flashing?
A Yes. Yes, he did.
Q Okay. And he physically blocked the victim's vehicle in?
A Yes.
Q Did he ask this victim for his ID?
A Yes, he did.
Q Did the victim have his ID?
A This victim did not have his ID at the time.
Q Did he state where his identification was?
A It was in -- yeah. This victim had two vehicles, and it was in -- actually, in his vehicle, in his other vehicle.
Q Okay. So, his vehicle that wasn't at the park?
A Yes.
Q Did the Defendant and similarly, you know, threaten to tow this person's vehicle?
A Yes, he did.
Q Was the victim able to actually pull up a picture of his driver's license to show the Defendant?
A Yes, he did.
Q How did he do that?
A He used his cell phone. He just had a -- he took a photo of his driver's license and his identification. I

guess, he -- and he just had it on his phone, and he pulled it up and showed it to him.

Q And so, the victim showed the Defendant a picture of his driver's license from the victim's phone?

A From the victim's phone. Yes.

Q Okay. And did the Defendant threaten to tow his vehicle?

A Yes, he did.

Q Did the Defendant physically take the victim's phone?

A Yes, he did.

Q Did he give those same threats that he was going to be arrested or go to jail?

A Yes.

Q And so, what option did he give this victim to?

A He gave -- he gave the victim the option of paying the drop tow fee. The victim said he didn't have any money, so he gave him the option. He said he would have to give him fellatio.

Q And did the victim comply with that?

A Yes.

Q Did the Defendant tell him that there was nothing the victim could do about it?

A Yes, it's either pay the money or do the sex act.

Q And did the Defendant threaten the victim if -- what would happen if the victim told anybody about what happened?

A Yes.
Q What did he say?
A He told him not to tell what happened and not to come back to the park anymore.
Q And so, did the victim, in fact, begin to perform oral sex on this Defendant?
A Yes, he did.
Q And what made the victim stop?
A He said it just was disgusting, and he couldn't -- he couldn't do it anymore.
Q And so, was the victim fearful of the Defendant?
A Yes. Yes, he was fearful of getting hurt.
Q Did he know whether or the Defendant had any weapons?
A Did he know -- yes. Yes. He had the gun.
Q Okay.
A Uh-huh.
Q And when the victim stopped, what happened next in this incident?
A When the victim stopped --
Q Stopped performing oral sex.
A When he stopped performing oral sex -- let me make sure.
Okay. When he stopped performing oral sex, the victim remembered he had $220 cash in his -- in his armrest, so he provided that to Mr. Ellis.

Q And that would have been in his car?
A That would have been in his car, yes.
Q And so, he ended up having to perform oral sex with the Defendant and still gave him cash as well?
A And still gave him cash. Yes.
Q And at that point, was the victim allowed to leave?
A Yes.
Q And when he left, was he instructed to not return to the park?
A Yes, he was.
Q But, ultimately, we see a second instance here on the timeline in April --
A Uh-huh.
Q -- of him coming in contact with the Defendant. Can you describe what happened on that incident in April of -- April 22nd, 2024?
A Yeah. So, the subject -- I mean, the victim was back at Cullen Park, and he was approached by Joey Ellis again.
Q Why was the victim back at Cullen Park?
A Because he had went for a run earlier that day because he was here for one at night, and he lost his wallet. He dropped his wallet, so he decided to go back that evening once he realized to go try to locate his wallet.
Q And so, you said he went back earlier in the day. Would that have been during a time of day that he thought

the Defendant was not working?
A Correct.
Q And you said he happened to lose his wallet, so he went back to retrace his steps?
A Correct.
Q Now, when the Defendant then did make contact with this victim, was the victim driving the same car as the initial incident or a different car?
A He was driving a different car.
Q And were there any other people at the park, or was it just the victim?
A No, there were other park attendees.
Q And so, you said that the Defendant pulled up behind him. Was the Defendant -- did he have his flashing lights on his vehicle?
A Yes, he did.
Q When the Defendant made contact with the victim, did the Defendant seem to recognize the victim?
A Yes, he said, "Oh, it's you, you didn't learn your lesson."
Q And you said that there were other people in the park. Did the Defendant ever have any contact with those other people?
A Yes.
Q And so, what did the victim do when the Defendant made

contact with other people?
A The victim decided to -- the Defendant decided to make an escape, and he --
Q The Defendant made an escape?
A The victim. I'm sorry. I'm sorry. The victim decided to try to make an escape, and he drove his car over a cement bumper stop or parking stop to try to get away.
Q And so, the Defendant's vehicle was at -- in some point, in some way behind the victim's vehicle?
A Yes.
Q And so, the victim chose to go forward?
A Yes.
Q Had to jump a bumper, whatever it's called?
A Yes.
Q Okay. And what kind of vehicle did this victim have?
A He was driving a Tesla.
Q Did the Tesla have the recording capabilities that Tesla's have?
A Yes.
Q And did he record this interaction then with the Defendant?
A Yes, he did.
Q And so, have you observed that recording?
A I've heard about it. I've -- I didn’t watch it, but I was told about it, I was briefed on it.

Q Okay. And so, based on what you've been described, is the Defendant seen in that Tesla video?
A Yes.
Q Is another park patron on that video?
A Yes.
Q Can you observe the Defendant's vehicle in that video?
A Yes.
Q Do you observe the victim hopping the curb to escape the park?
A Yes.
Q And at the point when the victim is escaping the park, what does the Defendant do?
A He gets in the city vehicle and chases him.
Q And are Park Rangers allowed to pursue other vehicles like that?
A No.
Q Were his lights flashing during that chase?
A Yes.
Q Did the victim believe the Defendant was trying to sideswipe his car?
A Yes.
Q And all of this is captured on that video you've been briefed about?
A Yes.
Q Was this victim provided a photo array of the

Defendant?
A Yes, he was.
Q Did he positively identify that photo array?
A Yes, he did.
Q And you said that the monetary amount was in cash, so there aren't any, like, Cash App transactions for verification?
A Correct.
Q Okay. Now, you've already just generally described it, so we're not going to go through every single detail with Victims 3 through 8. But just in general, we see here Victim 3 that on March 3rd, 2024, this involved a groping and $600?
A Correct.
Q And can you just briefly describe what happened in the groping in this instance?
A This victim was ordered to pull down his pants, and Mr. Ellis came in and groped his -- groped his genitals, and his buttocks, and his chest.
Q And moving on then to Victim 4, it says, "Thrown to ground and money." Would that be because there's perhaps a dollar amount that can't be verified through a Cash App transaction?
A Correct.
Q And for these three charges, it shows a robbery, which

involved the money, a gun charge, and a physical assault?
A Correct.
Q And what happened during the physical assault?
A Mr. Ellis threw the victim to the ground where he scraped his knees and his forehead.
Q And Victim 4, is this the victim that involved his friend also having to come to the park?
A Yes.
Q To your knowledge in the investigation, did either one of the people at the park have an audio recording that they conducted of this Defendant?
A Yes, they did.
Q And in that audio recording, can you hear the negotiation of the Defendant basically setting the terms for payment?
A Yes.
Q And that has been provided to FBI?
A Yes.
Q Now, let's move on to --
MR. AUSTIN: Quick question. Clarify. Which victim is that with the audio?
MS. SAUNDERS: Victim Number 4.
MR. AUSTIN: Thanks.
BY MS. SAUNDERS:
Q And in Victim Number 5, we just see a $300 monetary

transaction. Is that correct?
A Correct.
Q Victim Number 6, it says, "Removed from car and $350." We see for the charges of robbery, a firearm, and an assault. Can you describe the assault in this incident?
A Yes. Let's see here. Number 6?
Q Victim 6.
A Okay. Victim 6 was at the park, just letting his dog relieve himself, and he was approached by Mr. Ellis. Victim 6 was kind of skeptical of Mr. Ellis asking him for money and stuff, so he decided he was going to leave.
Mr. Ellis jumped in his vehicle and dragged him out, and the two got into a physical altercation, and Mr. Ellis drew his firearm and pointed it at the victim's chest.
Q And at that point, did it force the victim into compliance?
A It did.
Q Did the victim end up withdrawing cash to pay the Defendant?
A He did.
Q And in the scuffle of all that, did the victim lock his dog in the car and his keys in the car?
A Yes, he did.
Q Was an actual legitimate locksmith called out to the scene to have to unlock his car?

A Yes.
Q And did that locksmith also have to be paid money in order to open up his car?
A Yes.
Q Okay. And so, the money that he withdrew from the ATM, did that payment go to both Mr. Ellis and the legitimate locksmith?
A Yes, it did.
Q Okay.
A That's Mr. Ellis drove this victim to the ATM.
Q In whose vehicle?
A In the city vehicle.
Q So, the Defendant drove the victim in the city issued vehicle to withdraw cash?
A Yes.
Q And Victim 7, it says brush up and $100. Can you describe what that brush up means?
A Yes, I can. So, this is the victim. Mr. Ellis didn't believe he was there to work out and continued to say he was there for sex. Mr. Ellis took his ID and said he was there intentionally to meet someone -- meet someone for sex.
Let's see. Yeah. That too, right?
Q So, was this a -- we're just going to talk about --
A Uh-huh.
Q -- this encounter. And so, was this brush up? It was

-- you said that over the clothes that you described earlier today?
A Yes.
Q Okay.
A Yes, I did.
Q And a $100 Zelle transaction?
A Yes.
Q And we see then the sex crime and the robbery for that. So, now let's move on to Victim Number 8, where it's just the robbery, and it shows here $400. Did the Defendant actually take the victim's phone in order to Zelle himself the $400 amount?
A Yes, he did.
Q Did the victim try to cancel that Zelle transaction?
A Yes, he did.
Q Was he able to?
A No, he wasn't.
Q Now, these eight victims that are accounted for in this Indictment, have they all -- aside for Victim Number 1, which was the show of identification, did the other seven victims, were they provided a photo array?
A Yes.
Q And did they all positively identify this Defendant as being the one who perpetrated these crimes against him?
A Yes, they did.

Q Now, there are a couple of these where we talked about there being cash transfers, but any of the electronic transfers of money through Zelle or Cash App, has the FBI verified those transaction amounts?
A Yes.
Q For victims that went to ATM machines, have those ATM withdrawal amounts been verified?
A Yes.
Q And you said that there was an audio recording that was provided through Victim 4's interaction with the Defendant?
A Yes.
Q And that there was also a Tesla video recording provided by Victim 2 of the incident with the Defendant?
A Correct.
Q And based upon your review, does that corroborate the information that all of these victims have told you about how this scheme goes down?
A Yes, it does.
Q Now, you said it's an ongoing investigation. So, at this point, there's eight victims in the Indictment.
Has FBI been able to confirm any additional victims at this point?
A Yes, we have.
Q Approximately, how many additional victims are still being worked up as confirmed victims?

A We have 13 additional victims that are confirmed right now.
Q And is the information that they gave you similar to what has already been described for this Court?
A Yes.
Q And in addition to the 13 that have been confirmed, are there other possible victims that FBI is trying to make contact with to verify whether or not they're actually a victim?
A Yes.
Q Approximately, how many victims would that entail?
A Approximately 20 additional victims that were publicly ID’d and seeking information from.
Q And so, at this point, even though there's only eight in the Indictment, we're talking upwards of 40-ish plus victims that FBI is trying to confirm?
A Correct.
Q With 13 of those actually confirmed?
A Yes.
Q 13 additional.
Have there been any victims that have been identified that have indicated they're not wanting to participate in this case investigation?
A Yes, there are several identified victims who are afraid to participate.

Q And you said that they're afraid. What are some reasons for that?
A Just Mr. Ellis -- what they believe his official capacity is, so they're so they're afraid to come forward and be a part of the investigation.
Q But did they -- excuse me. Did they all express some sort of fear of the Defendant?
A Yes.
Q Okay. And did these victims describe any instances where the Defendant actually put their phone number in his phone and tried to subsequently communicate with them?
A Yes.
Q And did victims actually receive text messages from this Defendant?
A Yes, they have.
Q Regarding Zelle transfers, does that -- does a Zelle transaction occur through using people's cell phones?
A Yes.
Q And so, if I were to Zelle you money, I would use my phone number to Zelle you using your phone number?
A Correct.
Q So, would the Defendant have access to these victims who had to Zelle him money, their phone numbers as well?
A Correct.
Q You said along with their driver's licenses that

victims had described him photographing and videoing?
A Correct.
Q Now, taking a step back from the actual facts of this case, I want to talk a little bit about this Defendant and his pattern of disobeying instructions and orders.
You said initially, he was arrested out of Harris County for misdemeanor official oppression?
A Correct.
Q And that charge was around that June 10th date -- arrest day?
A Correct.
Q Ultimately, was he -- well, did he make bond in that misdemeanor case?
A Yes, he did.
Q Has he subsequently been charged in Harris County with any additional crimes?
A Yes, he has, ma'am.
Q Which crimes are those?
A He's been charged with an additional sexual assault and additional and -- any additional official oppression.
Q And so that second charge of official oppression, that's a misdemeanor?
A Yes.
Q And you said that he's been charged with a sexual assault. Is that a second-degree felony in the State of

Texas?
A Correct.
Q With a punishment range of two to 20 years?
A Yes.
Q So, at this point, at the State side, are there three victims listed?
A Yes.
Q And two misdemeanors and one felony, two to 20?
A Correct.
Q And he made bond in June of 2024?
A Yes.
Q As part of the condition of his bond, did he have any location restrictions?
A Yes, he did.
Q What was that restriction?
A Harris County and then contiguous counties.
Q And then contiguous counties?
A Yes.
Q And at that time, was he placed on a 12-hour curfew?
A Yes, he was.
Q And when he was given those bond conditions, were there -- when he initially made bond on June 12, did he sign his compliance acknowledging the bond requirements?
A Yes.
Q And then on the next day, on June 13th, did the

District Court Judge actually update those conditions?
A Yes.
Q And did he sign his compliance with those updates?
A Yes, he did.
Q And on both of those documents, does it detail the Harris County restriction?
A Yes.
Q To remain in Harris and contiguous counties?
A Correct.
Q Did he violate that restriction?
A Yes, he did.
Q How so?
A By going to Louisiana.
Q Was it within two months of him making bond?
A Yes.
Q Now, based on your information, what is your understanding of why he would go to Louisiana?
A He had his family in Louisiana.
Q But was that not addressed with the Court before he decided to disobey the orders and go to Louisiana?
A Correct.
Q Was his bond revoked in August based on that violation?
A Correct.
Q Was his bond increased based on those violations?
A Yes.

Q And was he still ordered to remain in Harris County and contiguous counties?

A Yes.

Q At that point, was he placed on a 24-hour house arrest?

A Yes, he was.

Q Now, subsequently in late August, did the bond conditions change out of Harris County to lift the restriction of staying in Harris County and allow him to go to Louisiana?

A Yes, it did.

Q But is that 24-hour house arrest curfew still in effect?

A Yes, it is.

Q And does the Defendant have to ask any sort of permission to leave for any purpose?

A Yes.

Q Okay. And so --

THE COURT: Wait, wait, wait. Hold on, Ms. Saunders. I want to make sure I understand that.

You're saying that the terms of the release in Harris County were revised so that he could travel to Louisiana with pre-approval or how -- how did he have 24-hour home confinement if he could travel to Louisiana?

MS. SAUNDERS: Yes, I can clarify that. I'm sorry, Judge.

BY MS. SAUNDERS:

Q Is the Defendant now living in Louisiana?

A Yes.

Q With a person who owns a home there?

A Yes.

Q And so, has his bond conditions been modified to allow him to stay at the house that is located in Louisiana?

A Yes.

Q Okay. But he is restricted to 24-hour home curfew --

A Correct.

Q -- at the residence in Louisiana?

A Yes.

MS. SAUNDERS: Did that clear that up, Judge?

THE COURT: Got it, thanks.

BY MS. SAUNDERS:

Q Ultimately, he could have addressed the Court ahead of time to accommodate that. But because he didn't, his bond was revoked due to his violation of not asking the Court for permission ahead of time?

A Correct.

Q Okay. Now, while he was employed at the Houston Parks and Rec Department, you said, or did you say, he's been employed since November of 2019?

A Yes.

Q And did he have any previous issues while he was

employed with that department?
A Yes, he did.
Q Can you tell the Court some of those issues that he had?
A He had a failure to complete daily activity logs, failure to --
MR. AUSTIN: Judge, I'm going to object. If he's a bad employee, I think that's clear by the charges.
MS. SAUNDERS: Your Honor, I would like to go into some of his additional compliance issues since --
MR. AUSTIN: But how is that germane to the case at hand?
THE COURT: I'm going to allow the -- I mean, you both have some leeway, so I'll let Ms. Saunders go forward. I assume what I'm about to hear is that his job asked him to do certain things, and he didn't do what they asked him to do. Mr. Austin's position is if they thought he is such a bad employee, why didn't they just terminate him, but I'll let you go forward.
MS. SAUNDERS: Yes, Judge. Thank you.
BY MS. SAUNDERS:
Q And so, did he have a failure to comply with duties at his job?
A Yes.
Q And issues regarding insubordination?

A Yes.
Q Failure to follow directives?
A Yes.
Q And did he also have any violations regarding using a firearm?
A Yes, he did.
Q What was that in regards to?
A He left a firearm in a city -- in a city vehicle, and another employee found it.
Q And why was that a violation?
A Because it's against their policy to have personal firearms.
Q Ultimately, based on a number of his work violations, what happened at his job?
A He was relieved of duty, or placed on leave at that point.
Q So, he wasn't terminated, just placed on leave?
A Yes.
Q Was he ultimately able to come back and continue working for the City of Houston?
A Yes.
Q Now, as this case was ongoing, was there any possible information that was given to Parks and Rec or the City of Houston regarding this possible criminal activity he was engaging in?

A Yes.

Q And was there a GPS tracker placed on his city issued vehicle?

A Yes.

Q And did he continue to engage in criminal conduct while on duty?

A Yes.

Q Were there any other issues regarding leaves of absences by --

THE COURT: Wait, wait, wait. Hold on one second. Explain that again. There was a tracker put on his car?

BY MS. SAUNDERS:

Q Yes. Will you explain that?

A Yes, the city vehicles have trackers on them that -- so they can track their employees' whereabouts. And once this allegation was made, Houston Police Department got involved, and they -- and they installed their own tracker on the vehicle.

THE COURT: What allegation was made?

BY MS. SAUNDERS:

Q So, before he was arrested on the night of June 11th, have there been some reports trickling in regarding Joey Ellis and what he was -- the type of conduct he was engaging in?

A Yes.

Q And so, was the Parks and Rec Department trying to verify if the Defendant was engaging in any of this conduct?

A Correct.

Q And this was before that June incident and Victim 1 actually called 9-1-1?

A Yes.

THE COURT: Wait, hold on, I want to make sure. Before the June incident, the city folks were aware of some potential illegal activity allegedly committed by Mr. Ellis?

THE WITNESS: Yes. Yes, sir.

THE COURT: Do you (indiscernible)? (Indiscernible).

THE WITNESS: Yes, sir. Yes, sir. Yes, sir. A tipster called in and provided information to the city that that these allegations were taking place at the parks.

THE COURT: Right. Was that tip recorded?

THE WITNESS: There were two tips called in. Do we have the dates? There were two tips called in to the city. One -- I don't want to give the wrong dates, but there were two -- there were two tips that were provided to the city of Mr. Ellis' activities.

BY MS. SAUNDERS:

Q Were they within a close --

THE COURT: Was this prior -- was this prior to the June incident?

THE WITNESS: Yes, sir.

THE COURT: Prior to the April incident?

THE WITNESS: Let's see. We're trying to get the dates here. But, yes, it was prior to April.

THE COURT: Prior to the March incidents?

THE WITNESS: Give me one second, sir.

THE COURT: Sure.

(Pause in the proceedings)

BY MS. SAUNDERS:

Q Do you recall the date around April 26th being a date of interest?

A Yes.

Q Okay.

THE COURT: All right. So, Agent Williams, so sometime in April, you get -- the city gets a couple of tips that there might be alleged illegal conduct going on and the city then puts some sort of tracking device on the car? Is that correct?

THE WITNESS: Yes, sir.

THE COURT: And what happened -- how can we tell if he did anything wrong based on the tracking device alone?

MS. SAUNDERS: If I can ask a couple of questions regarding that?

BY MS. SAUNDERS:

Q For the Park Rangers --

THE COURT: Hold on, hold on. I mean, let him answer that question.

MS. SAUNDERS: Yes, I think that there is some context he needs to give you first so that will make the answer clear.

THE COURT: Okay. Go ahead.

BY MS. SAUNDERS:

Q For the Park Rangers, where did they all collectively station while they were on their night shift?

A They would all collectively station at Hermann Park.

Q At Hermann Park?

A Yes.

Q But these incidents were suspected of being occurred at which city park?

A Cullen Park.

Q And so, would the tracking device help distinguish if he was leaving Hermann Park and traveling to Cullen Park?

A Correct.

Q And so, is that why they were trying to look at his GPS tracker to figure out if he was going to be leaving Hermann to go to other parks that he wasn't supposed to go to?

A Correct.

MS. SAUNDERS: Does that help clear that up, Judge?

THE COURT: (Indiscernible) he should not have

been at Cullen Park, but the tracking device pinpointed him at Cullen Park? Is that what you're saying?

THE WITNESS: Yes, sir. He should not have been at Cullen Park.

THE COURT: Okay. All right. Please proceed, Ms. Saunders.

BY MS. SAUNDERS:

Q And so, was Parks and Rec, were they trying to verify or, you know, monitor the Defendant by utilizing a GPS tracker?

A Yes.

Q Okay. And then after -- yeah. Obviously, he was arrested in June, and so they hadn't been able to completely investigate all of the ins and outs of where he might have been going during his time frame there?

A Correct.

Q Okay. Before he was -- or actually, we were talking, I think, about some leaves of absence. Was he -- was he also on any other leave of absence while at the Parks and Rec Department?

A Yes, he took a leave of absence for mental health purposes.

Q And can you tell the Court a little bit about what happened there?

A He was going through a divorce, and law enforcement got

involved because his wife called law enforcement. And because -- and they removed all the firearms from his house and because he was having a mental health crisis.
Q And so, guns were confiscated during that incident?
A Yes.
Q Prior to working for Parks and Rec, do you have any information about a previous employment?
A Yes, he worked as a detention officer in Louisiana.
Q And for approximately what time frame?
A That time frame is -- I have that with me right there.
Q Do you recall it being around 2014 to 2016?
A Yes.
Q Okay. And did he have any incidents while in the scope of his employment there?
A Yes, he did.
Q What were some of those incidents?
A There was allegations of sexual abuse of inmates.
Q Was there any criminal charges that were filed?
A Nothing that was -- no. No charges were -- actually, no convictions or anything like that.
Q Okay.
A Uh-huh.
Q And was he ultimately terminated?
MR. AUSTIN: What's the answer? Were there any charges or not?

THE WITNESS: Were any charges --

MR. AUSTIN: His answer was no convictions.

MS. SAUNDERS: Any criminal charges that were filed.

THE WITNESS: Not to my knowledge.

BY MS. SAUNDERS:

Q And so, there were just some internal investigations regarding that?

A Yes.

Q Was this Defendant ultimately terminated from that job?

A Yes, he was.

Q Why was he terminated?

A Because of that instance, and there were -- there was another instance where he entered a pod without locking down the cell. So, they used that in this other instance to terminate his employment.

Q And so, have not -- again, not following procedures and compliance with orders?

A Correct.

MS. SAUNDERS: I'll pass the witness, Judge.

THE COURT: Okay. Let me ask a couple of questions. I want to make sure I understand what happened with the State charges.

The charges out of 280th Harris County District Court, he made bond on June 13th. And according to the pre-

trial report, a bond violation was filed for travel (indiscernible) on August 16th (indiscernible) he went to Louisiana without permission?

MS. SAUNDERS: Yes, Your Honor.

THE COURT: Okay. Then it says on 8/25, the order was amended to add home incarceration (indiscernible). Is it safe to assume that (indiscernible) led to the -- he now have a GPS car and he was -- had to be at home in Louisiana -- at the home in Louisiana?

MS. SAUNDERS: Yes, Your Honor.

THE COURT: And then it says on 08/26 the bond was (indiscernible).

MR. AUSTIN: Judge, we didn't hear the last part.

MS. SAUNDERS: Yeah.

MR. AUSTIN: What was the last question, Your Honor? We didn't hear it.

THE COURT: On 08/26 according to pre-trial report, it says bond revoked. What happened there? Meaning, if the order was amended and home incarceration and GPS was added on August 25th, why was bond revoked on (indiscernible)? I don't understand.

MS. SAUNDERS: So, what I can see from the Harris County bond paperwork, I don't know there might be a typo in the pre-trial services report, but it looks like he made bond out of Harris County on June 12th. And on June 13th,

some bond conditions were amended. Then there was -- the motion to revoke that was filed on August 16th. Yep. That's correct. The motion to revoke based on traveling to Harris County.

I do see that on August 21st, there's a second amended order of conditions where it still says to remain within Harris County and contiguous counties. And that was signed on August 21st. And I do see the Court directive that was filed on August 26th. It says bond revoked and raised 826.24 by Judge Armstrong.

It is our understanding that that was based, though, on the travel to Louisiana, but I wonder if it's because those -- the bond requirements still said remain in Harris and contiguous counties.

But, ultimately, on the August 26th bond conditions, the date that his bond was revoked, his bond conditions were amended, and that restriction to remain in Harris County was lifted.

And so, his bond was revoked. It was raised to, I believe, 60,000, and then the bond conditions were amended. Ultimately, the Defendant posted bond even though it was raised, and then he was allowed to go to Louisiana but remain in home confinement in Louisiana.

So, I think that there are perhaps a couple of things happening before the actual final bond condition was

corrected to allow him to stay in Louisiana.

THE COURT: What happened on October 14th, 2024? According to the --

MS. SAUNDERS: October 14th --

THE COURT: -- pre-trial, it says bond violation filed based on GPS violation.

MS. SAUNDERS: According to the Harris County records, it says that the Defendant was issued a GPS device on 9/11 with house arrest. The Defendant received a curfew violation on the following dates, 10/09 at 10:53 a.m. unapproved leave, and 10/09 11:50 a.m. unapproved enter. The Defendant on 10/09 was traveling 16 miles per hour on Parliament Drive. The Defendant is not following curfew as instructed.

Now, I say that, Your Honor, in full -- being fully candid with as a note of caution. Even though I see that there was a curfew violation during these daytime hours, I can see on a prior bond condition report that he asked to go to an interview, and it was dated on the October 7th bond conditions. And it says Judge has granted permission for the Defendant to go to an interview on Wednesday, September 9th.

I think that's a typo because Wednesday -- September 9th is a Monday. October 9th is a Wednesday. So, I think that there was a typo that actually allowed him to

go to an interview at 11:00 a.m. and that he was actually traveling to an interview he was authorized to go to.

So, even though it does have a bond violation and I haven't been able to verify that, I do believe based on reviewing the documents that he had actually received permission to go to a job interview, and they just input the date of the interview incorrectly in the bond conditions.

THE COURT: So, the Government's contention is that Mr. Ellis violated the State conditions of release by travelling outside of Harris County and the contiguous counties to Louisiana back in -- sometime in June, July or August of 2024?

MS. SAUNDERS: That's correct.

THE COURT: Okay. Mr. Austin, any questions for the witness?

MR. AUSTIN: Yes, thank you. Thank you, Judge.

CROSS-EXAMINATION

BY MR. AUSTIN:

Q So, can I just keep the Government's Exhibit 1 up for you to refer to, Special Agent?

THE COURT: Sure. Okay. Let's do this. I need to get a throat lozenge. So, let's take a two-minute break. We'll be back (indiscernible). So, let's go off the Record for two-minutes.

MR. AUSTIN: Sure. Okay.

(Recess taken from 11:04 a.m. to 11:09 a.m.)

THE COURT: Do you need some more time, Mr. Austin?

MR. AUSTIN: Yes, Your Honor.

All right. Ready, Your Honor?

THE COURT: I was asking if you needed more time.

MR. AUSTIN: Oh, no, no, no. I'm ready.

THE COURT: Okay.

CROSS-EXAMINATION (CONT'D)

BY MR. AUSTIN:

Q Agent Williams, just so -- if you could have that Government's Exhibit 1 handy?

A Yes.

Q Okay. Now, I think -- well, let me just start. You were just asked at the end of direct examination about the difference between Hermann Park and Cullen Park. Is it that your understanding is Mr. Ellis is never to patrol or work Cullen Park?

A No. He is -- it's my understanding that he would get a directive from dispatch to go to that park if they haven't had an issue.

Q Okay. And when he was arrested, where was he arrested?

A He was arrested at Cullen Park.

Q Okay. And that was based on Exhibits 2 and 3?

A Correct.

Q At what time was his arrest?
A That was approximately around 11:00 o'clock that night.
Q 11:00 p.m.?
A Yes.
Q And just sticking with Exhibit 2 and 3, that was on June 10th, right?
A Yes.
Q And what time -- if I recall, you said this gentleman ran through the bushes or something and was able to call the authorities?
A Correct.
Q The guy that's listed as Victim 1, JLB?
A Correct.
Q And did he actually call other people to the park before?
A Correct.
Q So, how long -- what was the -- what was the time period that he's alleging he was involved with Mr. Ellis before he ran away? How long are we talking?
A I don't have an exact amount of time.
Q All right.
A If that's what you're asking. I don't have an approximate amount of hours or minutes they were together.
Q Do you know what time these alleged folks came to the park that he told them to shoo away?

A Nope. I do not have the times that that the victims -- the additional victims showed up to the park.

Q Did the authorities interview these additional victims that Victim 1 allegedly called to the park?

A They were gone.

Q But did the -- did the FBI or anybody else do any follow-up and say if they actually showed up to the park or not or were called to the park?

A Yeah. We've done a bunch of follow-up and investigation. We have not been able to identify those -- the victims that were called to the park that night.

Q All right. So, so far, just with Victim 1, you're not able to corroborate his story?

A As far as -- ask that again.

Q As far as Victim 1 is concerned, you're not able to corroborate anything he said?

A No, we're able to corroborate --

Q Excuse me. I said that incorrectly.

In terms of the calling of other people to the park, you are not able to corroborate so far?

A Correct.

Q All right. I do know you pointed out that there was, like, some cash transactions for sure, right?

A Correct.

Q Or Zelle or something like that?

A Correct.
Q But in terms of -- do you know what time that transaction was?
A There was a time -- let's see. We have the financial records. I don't -- it's not necessarily in the interview right now, so.
Q It's okay.
A Yes.
Q No problem. And then -- and the point is, I guess, the investigation is still continuing?
A Very much so. Yes, sir.
Q All right. So, I have to be guided by some of my questions then as well.
A Okay.
Q All right. Now, in terms of -- so, he is entitled -- I guess, there is a point where he, Mr. Ellis, would be at Cullen Park, just to clarify?
A Yes.
Q And on an as-needed basis?
A Yes.
Q And is Cullen Park -- what are the hours of the park being open or closed?
A There are no posted hours on -- at the front of the park. So --
Q So, it's a 24-hour park?

A Yes. I would consider it, so.
Q Okay. So, people can come and go at any time in Cullen Park?
A I would've -- there's no posted hours on at the park.
Q All right. And all these victims in Government's Exhibit 1, all of them were at Cullen Park?
A No, not everyone.
Q Which one was not at Cullen Park?
A Let's see which victim. (Pause)
Victim 7 was not at Cullen Park.
Q Okay. Were Victims 3, 2, and 1 at Cullen Park?
A Let's see. I'm still looking through the 302s.
Q Well, in turn -- I'm just going to key in on those because they've been indicated as the Government's Exhibit 1 is a potential sex crime or something like that, right?
A Correct.
Q And so, you're saying Victim 7 wasn't at Cullen Park, right?
A Correct.
Q What about Victim 3?
A Yes, he was there.
Q And Victim 2?
A And Victim 2 is -- yes, he was there.
Q All right. And what was Victim 3 -- I don't know if I heard that. Oh, he was groped, correct?

A Correct.
Q All right. And victim -- were all of these victims alone when they were approached by Mr. Ellis?
A Not all of them.
Q Okay. So, who was not by themselves? Well, let me just stick with -- Victim 1, we know was by himself, correct?
A Correct.
Q And I think you said Victim 2 was by himself --
A Correct.
Q -- because he was -- he came back to the park, right?
A Correct.
Q When did he get encountered in April, the second time, by Mr. Ellis? What time was that?
A The second time was around 9:00 p.m.
Q Okay. And he said he had lost his part -- his wallet, that was that guy?
A Yes, sir.
Q And Victim 3, what time of the day was he approached by Mr. Ellis?
A Around 11:00 p.m.
Q All right. And was he by himself?
A Yes, he was.
Q And Victim 2, the first time, what time of day was that in February 24 -- February of 2024?

A Time of day the first time. It's going to be around approximately 9:00 p.m.

Q All right. And you said somebody was driven to the ATM?

A Correct.

Q Which was that, Number 6, Victim 6?

A That was, yes, Victim 6.

Q Did it indicate who called the locksmith or anything like that, for example?

A Say that again.

Q Are you made aware, or did the victim or anybody indicate who called the locksmith?

A Mr. Ellis did.

Q Okay. So, he was there when the locksmith came?

A Yes.

Q All right.

A He paid the locksmith and showed the victim the -- showed the victim the receipt.

Q Mr. Ellis paid the locksmith?

A Yes.

Q Or the victim paid the locksmith?

A Mr. Ellis did.

Q I thought the victim pulled the money of the ATM.

A He did.

Q And gave the money to Mr. Ellis for the locksmith?

That's what is the allegation or part of the allegation?
A He gave the money to Mr. Ellis because he was ordered to --
Q Right.
A -- to not go to jail and have his car towed.
Q Okay. But he was kind enough to call the locksmith, right?
A Mr. Ellis?
Q Yes.
A Yes.
Q And this was the guy with a dog?
A Correct.
Q Was the dog in the car?
A Correct.
Q All right. Got it.
And the Tesla curb incident was with Victim 2, right?
A Correct.
Q And we're going to get a video on that, I assume?
A Correct.
Q All right. And he said he didn't want to be bothered with Mr. Ellis, essentially, so he drove his car over the curb to get out of -- to get out of there?
A I think he was frightened, and he did what he needed to do to get away from the situation.
Q Okay. Did any of these guys confirm they were on some

Sniffies app?
A Yes.
Q All of them?
A No, not all of them. No, sir.
Q All right. Did victims -- well, we know Victim 1 was on the Sniffies app, right?
A Correct.
Q Because he allegedly called a bunch of other people to be, I guess, harassed or arrested in some form, right?
A Correct.
Q Did Victim 2 claim to be on the Sniffies app?
A Victim 2 was there to work out. He was not on the Sniffies app.
Q All right. So, Victim 3, is he on the Sniffies app?
A Victim 3.
Q Because you said one of them gave him oral sex, right?
A Correct.
Q Which one was that?
A It's going to be --
Q Is that Victim 2?
A Yes, Victim 2.
Q All right. And Victim 2 was by himself, right?
A Correct.
Q And he's alleged to have given oral sex in February on the first encounter, right?

A Correct.
Q And you're not sure if he is on the Sniffies app or not?
A As far as I know, he was just there to workout, sir.
Q All right. And what about Victim 3? That was a groping, right?
A Victim 3 was a groping, yes.
Q So, not quite the same sexual assault, essentially, right?
A Say that again?
Q It's not quite the same sexual assault as what happened to Victim 2.
A Not the same sexual assault, but a sexual assault.
Q Right.
A I don't --
Q I mean, I understand.
A -- I don't (indiscernible).
Q Like, it's an unwanted or unconsented touching or what have you, right?
A Yes.
Q But there's a -- I think there's a distinction between Victims 3, 7, and 1, or at least 3 and 7 compared to Victim 2, right?
A Explain that. What do you mean, sir?
Q Victim 2 actually performed a sexual act or --

A Yes.
Q -- was receiving -- one or the --
A Yes.
Q -- other, right?
A Correct.
Q So, there is some level of distinction?
A Correct.
Q All right. Not obviously in law enforcement, you're treating them all the same, but in terms of actual act, there is a distinction.
A Yes. A difference in what act was performed. Yes.
Q Thank you.
Now, does Mr. Ellis do -- correct me if I'm wrong. Like, in law enforcement, you've been doing this, like, 15-plus years. Sometimes you guys write what your shifts are and what you do during the day. You take notes, right, of memos and things like that, right?
A On the Federal level, it's kind of different. We don't do, like, shifts. I'm trying to understand.
Q Were you ever --
A (Indiscernible) answer your question the best way you can.
Q Sure. Have you ever been a police officer --
A No.
Q -- or you're always a FBI agent?

A Always a Federal agent.
Q All right. In the course of your experience as a FBI agent, have you ever read, for example, police memos, like, of what they did during the day, during their shifts? Have you ever looked at any of those?
A No, I've read plenty of police reports, but never just a kind of --
Q All right.
A -- chronological what they do during the day.
Q Do you know if the Park Rangers do any such kind of chronological report making?
A Yes, I know that -- at the end of this shift, yes, they do.
Q All right. Did Mr. Ellis do any such report, writing in any of his shifts?
A I'm going to assume so, yes.
Q All right. Did he indicate, for example, he called a tow truck person for a person's name or anything like that? Do you know?
A I'm unaware of that right now.
Q All right. And that would go for, like, all the incidents. Are you unaware?
A He is not supposed to call a tow truck. He's supposed to call dispatch, so --
Q No. I mean, we know what he's not supposed to do. I

think you've made that clear. I'm asking, do you know if he indicated, for example, he encountered anybody on these different dates or not in his memorandums or anything like that for work.

A Got it. Okay. I'm tracking. Oh, yeah. I'm not aware of -- I'm not aware of that right now.

Q Okay. Thank you.

Now, I believe the marshals arrested him this week -- earlier this week?

A No, sir. We did.

Q The FBI did?

A Yes.

Q All right. Where did you arrest him?

A At Harris County Courthouse.

Q Was he scheduled for court that day?

A Yes, he was.

Q Was he in court that day?

A Yes, he was.

Q Did you have to tackle him or chase him out of the building to arrest him?

A No, sir.

Q All right. He kind of went willingly?

A It was -- yes. Without incident, yes.

Q Without incident. Thank you.

And you knew exactly where to find him, which was at

court, right?
A Correct.
Q So, you were asked a series of questions about compliance. Essentially, the argument, I assume, is that he won't come to court, but you found that to be -- he absolutely will come to court, huh?
A I can't say absolutely, sir.
Q Well, you absolutely found him in court where you expected him to be, right?
A Correct.
Q He wasn't trying to run from the responsibility of going to face charges in State Court, right?
A Correct.
Q Okay. And you knew where he was living too prior to arresting him at court?
A Correct.
Q And if you chose to, you probably could have contacted his family to say, hey, we'd like him to come in on a summons or something like that. And you would have been able to ask him to show up to Federal Court as well, right?
A We've never operated like that, so I can't really answer that question, sir.
Q You don't know that people get summons to court?
A I've never done that.
Q Okay.

A We've always, in fact, affected our arrest.
Q Like, in secrecy?
A I don't know what that -- what do you mean?
Q Like, you sprung up on him rather than tell him, hey, we'd like you to just come in, answer this Indictment? You always do it in secrecy so they don't know you're coming?
A Yeah. Our warrants are always sealed. Yes.
Q Okay. Now, if they were having sex in the park, just as an example, is that a crime or not?
A If they're having sex in the park, is that a crime?
Q Or not? You indicated on -- let me go back. Let me frame it correctly.
On Direct, you said that Mr. Ellis was allegedly telling people they were committing a felony or they could go to jail, or their car could be towed for having sex in the park?
A Correct.
Q Is it a crime or not to have sex in the park at Cullen Park?
A I'm not aware of the State laws. It's not a Federal law, so I'm -- I don't want to assume that that there's --
Q You don't want to assume that it's not against the law to have sex in a public park?
A It's not a Federal crime, so I'm going to assume that that there is an indecency law if you're asking me that.

Q Okay.
A (Indiscernible).
Q And if you -- and if you are arrested on an indecency law, could your car be towed if your car is left?
A According to the policy of the Park Ranger, the car would get a ticket, would get three tickets issued over the course of three days, and then a tow sticker would be placed on there, and additional time would be placed on the vehicle to be towed. So, nothing is immediate --
Q Uh-huh.
A -- as far as towing.
Q But the car could be towed?
A Eventually. Yes, sir.
Q All right. And so, you understand that, right?
A (No audible response).
Q You understand that, right, the car could be towed?
A Eventually, yes.
Q All right. So, it's not exactly, like, that couldn't -- that could not have happened as you alleged on Direct, right?
A What are you asking me, sir?
Q I thought you said that it's just -- like, it's not a -- it's not a truthful thing that they were committing a felony or not, they could go to jail or not, and their car could be towed or not. I thought you took some kind of

position as if to say none of those things were a possibility of happening for being caught having sex in the park.
A I don't recall ever saying anything about --
Q Okay. Well, great.
A What are you asking me? I'm trying to understand your question.
Q I think -- All right. I'll ask it again. Is it -- just for clarification.
A Uh-huh.
Q Is it a possibility in your head or in your mind that if somebody gets caught having public sex in a park, they could go to jail?
A Correct. Yes.
Q Is there a thought in your head or in your mind that if they get caught having sex in the park, it might be committing a crime?
A Yes.
Q Is it a thought in your mind or in your head that as a result of committing a crime or even going to jail, their car could be towed?
A Yes.
Q All right. And so, I think what you testified to on Direct is when he catches such people doing those potential acts, his job is to call the HPD, correct?

A Correct.

Q All right. He is not to take any other action other than call the HPD?

A Correct.

Q And why would he be calling the HPD?

A Because he's not allowed to enforce anything.

Q But what would the HPD be enforcing?

A Whatever he alleged happened.

Q Right. Which could be a crime, right?

A Correct.

Q So, the whole idea of it is, hey, guys. You're not supposed to be having sex in the park. I'm going to call HPD. And your position is he used that as a opportunity to abuse these people, right? I mean, that's the case.

A Say it again.

Q If he's supposed to call HPD --

A Uh-huh.

Q -- your position, the Indictment, everything about this case says he caught people in an act of a crime, and he is abusing whatever authority or perceived authority he has, right?

A We just said these people were alone.

Q That's what you said.

A Uh-huh.

Q You weren't there, right?

A Nope.
Q There was no video?
A There's is video of -- and audio of some of it. Yes, sir.
Q I said -- okay. Is there a video and audio of what happened on February 20 -- in 2024?
A Nope.
Q Is there any video or audio of what happened in March 3rd, 2024?
A March 3rd? No.
Q Right. So, you have no way of knowing right now, independently, if those people when they were approached allegedly by Mr. Ellis, if they were alone or if they were actually committing a crime.
A Correct.
Q That's the point.
A Correct.
Q All right. And so, with that understanding, going forward, the Indictment's whole point is he's abusing a perceived position of authority, right?
A Correct.
Q And that would kind of make sense if they were acting in a criminal capacity --
A Correct.
Q -- at the park, right?

A Correct.
Q All right. And I assume, just off the top of my head, all those victims are saying, we didn't know what to do. We were forced to do all these things in order to stay out of trouble, right?
A Correct.
Q So, if they were just walking, they wouldn't feel compelled to do anything other than try to run away or, you know, call the police immediately, right?
A If they -- if they would just walk -- say that again.
Q If they were just walking the dog --
A Uh-huh.
Q -- and this guy comes up and demands oral sex. What -- let me -- let me ask this question: When did Victim 2 call the police? When were the police called on the February 24th incident?
A With Victim 2. Let's see. He didn't.
Q All right.
A Uh-huh.
Q How did you guys get in touch with Victim 2?
A We found them and located all of our victims.
Q How? How did you do it?
A What do you got, like --
Q How did you find Victim 2? How did you locate him?
A We used -- let me see if there was one. Well, we have

we have financial records, and we located victims through that means.

Q All right. So, Victim 2 didn't pay him any money, did he, or he did?

A Victim 2 --

Q Oh, I'm sorry. It was $200. Was that Cash App or something?

A Yeah.

Q Or was it cash?

A Victim 2 had 200 bucks in cash in his console.

Q All right.

A Yes.

Q All right. So, you went back through the records and found Cash App with Zelle transactions, and you found victims that way?

A Yes.

Q All right. That's fair.

A And we had victims come forward through tip lines and --

Q For sure. But as far as Victim 2 is, he was -- he was not somebody that outcried?

A Correct.

Q All right. And he's the only one that has alleged actual, like, sex, oral sex, or otherwise, right?

A Yes, yes, yes.

Q All right. Cool. Victim 3, you found him the same way?
A Yes.
Q Cash App?
A Yes. We used one -- yes. Yes, we have records how we found our victims --
Q No police -- no police call --
A No police call.
Q -- for Victim 3?
A Correct.
Q All right. Victim 4 is an uncertain amount of money. So, what was his cash in March 12th, 2024?
A Cash and ATM withdrawals, yes.
Q All right. He called the police?
A No.
Q And over in March, there's a Victim 5. That was just cash, right, or money? Did he call the police?
A No.
Q That was through Cash App or Zelle or something like that?
A Let's make sure.
Q Well, maybe cut to the chase.
A Okay.
Q That'd be easier. Who called other than Victim 1 called the police?

A Just Victim 1 called the police.
Q All right.
A Uh-huh.
Q And you were -- I shouldn't say you because you're the FBI. But the authorities, I think, were investigating this as early as April?
A Correct.
Q All right.

(Pause in the proceedings)

MR. AUSTIN: Just in terms with the bond revocation issue, I think I can kind of speed that up, Judge.

BY MR. AUSTIN:

Q Do you have any reason to believe or know that he missed court since he's been arrested?
A No.
Q All right. Have you seen his face plastered on the news at all?
A Yes.
Q All right. His actual face is on the news, right?
A Correct.
Q He's got -- this case has gotten media coverage, right?
A Correct.
Q All right. And he initially was charged with a misdemeanor, then you guys -- I shouldn't say you guys, but

the authorities, the State charged him again with that sexual assault case, right?
A Correct.
Q And he has since been to court on that sexual assault matter, right?
A Correct.
Q And as far as the allegations are concerned, in the Federal case and the State case, they're pretty much the same allegations. He was abusing his position of trust or authority and taking advantage of alleged or perceived victims, right?
A Yes.
Q All right. So, this is not a shock that somebody's alleged a sexual assault on them?
A Correct.
Q And he still went to court, right?
A Correct.
Q All right. And all those times where he was not compliant with, I guess, his job, none of that led to any arrests, right?
A Correct.
Q He has never been arrested before as far as you know?
A Correct.
Q No criminal history as far as you know?
A Correct.

Q No jaywalking?
A Correct.
Q No, like, marijuana? None of that?
A Correct.
Q Okay. And so, so far, the issue is he went to Louisiana. We don't know exactly why. And he went to a job interview. That's the basis of his bond violations, right?
A Correct.
Q But the Court has since amended his bond to be on house arrest in Louisiana with his family?
A Correct.
Q All right. And you were able to confirm that as part of your due diligence in order to get a warrant, right?
A Correct.
Q All right. Did you actually go to Louisiana and, like, do any surveillance?
A No.
Q Okay. Did you send anybody to do that?
A No.
Q All right.

MR. AUSTIN: I think I'm almost done, Judge.

BY MR. AUSTIN:
Q Oh, the bond also was being increased. The amounts were increased, which means he had to pay extra money, right?

A Correct.

Q All right. Or the family had to pay extra money, correct?

A Correct.

Q All right. Okay. Do you -- did anybody ask him -- did he think he had the authority to go to Louisiana? Meaning, did he tell a lawyer or somebody told him he could go? Do you know if that happened or not?

A I have no clue about that. Sorry.

Q No problem.

MR. AUSTIN: Nothing else. Pass the witness.

THE COURT: Any further questions, Ms. Saunders?

MS. SAUNDERS: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. SAUNDERS:

Q I have some questions for clarification. I'd like to talk just a moment about Sniffies and how a person can be a user and what information it might have. I know there was a question about Cross-examination trying to follow-up with the Sniffies users that Victim 1 was communicating with on the park that night?

A Correct.

Q When you create an account through Sniffies, do you have to put specific identifying information about yourself?

A Yes, you do.

Q What sorts of information do you have to put?
A Name and a way to be contacted in there.
Q But is that required?
A Yes, that's required.
Q Are you sure about that?
MR. AUSTIN: Okay. Sounds like a bad question, Judge. I'm going to object.
BY MS. SAUNDERS:
Q Are you -- are you --
THE COURT: If you could rephrase it.
MS. SAUNDERS: Yeah.
BY MS. SAUNDERS:
Q Do you know how a profile is created on Sniffies?
A I have not.
Q Okay.
A I'm not familiar with creating a profile on Sniffies.
Q So, specifically, have you been able to identify who Victim 1 may have been communicating with through the Sniffies database on that date in June?
A Yes.
Q You've been able to verify the identities of who Victim 1 was communicating with?
A The victims that he called?
Q Yes.
A No, no.

Q Okay. Sorry. I might have worded that poorly. So, you haven't been able to verify who those people are?
A No.
Q Okay. And just a point of clarification, all of the Park Rangers you said, the kind of their staging site is at Hermann Park?
A Correct.
Q But if there are any, let's say, alarms or, you know, some -- an issue at one of the other city parks, how does a Park Ranger then end up having to get dispatched to go out to an alternative park?
A They're going to get that information from their City of Houston Park Ranger dispatch, and they will -- they'll direct them to where whatever issue is going on.
Q Okay. So, there may have been opportunities where the Defendant was, in fact, dispatched to Cullen Park?
A Correct.
Q Okay. But that would have come through the dispatch station?
A Correct.
Q And a quick point of clarification on the incident where the locksmith had to come out.
A Correct.
Q You said that the Defendant took the victim in his city issued vehicle to get funds from an ATM machine?

A Correct.
Q And did the victim give those funds to the Defendant?
A Yes.
Q Did the Defendant use any of that? I think it was, like, 400-something-dollars. Whatever the amount was, did he use some of that money to pay the locksmith?
A Yes.
Q And then kept the remainder of that money?
A Correct.
Q All right. And then in terms of the Federal sex crime offenses, is it true that there are varying levels of a sex crime?
A Correct.
Q And Victim 2 is the only victim at this point that has had, for this Indictment, the oral penetration?
A Correct.
Q All of the other ones have been a physical touch touching in some capacity --
A Correct.
Q -- for the sex crimes?
A Correct.
Q And if the Defendant kept a daily log in the scope of his employment, do you have any indication that he self-reported committing criminal conduct against victims?
A No.

Q That's something that a person might put on their daily report log?
A No.
Q Now, you said that you were unsure about State laws. So, is it your testimony today kind of speculative about whether or not it's a crime to have sex in a park?
A Yes.
Q And you said that there may be some sort of an indecent charge, but you don't actually know what the Penal Code is for the State of Texas for that?
A Correct.
Q But regardless, even if it was a trespassing or any sort of a crime that was occurring at the park by a victim, did this Defendant have the authority to arrest that person?
A No.
Q If a Park Ranger makes contact with someone that they feel is violating a park rule, what is their instruction to do?
A They're instructed to try to stop it. And if it -- if the park rule is continued to be broken, they're going to call dispatch, and dispatch is going to call a marked unit.
Q So, if they say you're here after hours, the park is closed, do they ask them to leave?
A Yes.
Q And if the person doesn't leave, do they say, I'm going

to call HPD?
A Yes.
Q Do they ever -- are they ever allowed to just threaten we're going to have you arrested?
A No.
Q Okay. And on all eight of these victims, I know that there is a question about whether you can arrest someone who's having sex at a park after hours. All eight of these victims, were they there by themselves?
A Yes.
Q And the only time another person came was when Victim 4 had to call a friend?
A Correct.
Q Because Victim 4 is being basically held at ransom for a friend to go get money?
A Correct.
Q And so, none of these eight victims were actually there being caught having sex with somebody in the park after hours?
A Correct.
Q This is just the Defendant alleging that's what they were there to do?
MR. AUSTIN: Objection, Judge. He already said there's no video. We don't know that. This is all argumentative at this point.

THE COURT: Hold on. If the witness knows, he can say that he knows. If he doesn't know, he'll say he doesn't know.

BY MS. SAUNDERS:

Q Based on the information that you've received --

MR. AUSTIN: Yeah, but based on the information it assumes, right, Judge? This is all argumentative at this point. I'm just objecting.

THE COURT: Objection overruled. He can answer the question.

BY MS. SAUNDERS:

Q Based on any of the information that you guys have investigated or received, have any of these victims been caught having sex -- were they there caught having sex by Defendant?

A No.

Q Did the Defendant ever call HPD to say, hey, there's some guys here having sex after hours?

A No.

Q Hey, we need law enforcement to come out because there's people here breaking the law?

A No.

Q Did that ever happen?

A No.

Q Now, I want to talk about Victim 2. Actually, Victim 1

was the day of the Defendant's arrest. Have you reviewed any of the information regarding the night of his arrest?
A Yes.
Q Did the Defendant actually show the HPD officers where he was in the Sniffies app communicating with Victim 1?
(Pause in the proceedings)
A Uh-huh. Yes.
Q The Defendant showed HPD officers where he, in fact, was communicating with Victim 1 on the Sniffies app on a cell phone?
A Correct.
Q And does this corroborate the information that Victim 1 also told Houston Police Department?
A Correct.
Q Now, talking about Victim 2, one point of clarification during that Cross-examination. Victim 2 is the one that paid 200-something-dollars based on cash found in a center console?
A Correct.
Q So, you guys did not track Victim 2 through any sort of a Cash App transaction, correct?
A Correct.
Q How did Victim 2 report to FBI that he was a victim? Did y'all find him, or did he outcry perhaps after seeing the Defendant on TV?

A It was -- it was an outcry.

Q Okay. So, y'all didn't go and find Victim 2. He found y'all?

A Correct.

Q But some of the other Cash App or Zelle transactions, were you able to kind of search backwards and then find some other victims?

A Correct.

Q Okay. And to be clear, because I'm not sure if I misheard, but to clarify, when there was a sentence or the question about this investigation began as early as April, that's not FBI's investigation, correct?

A Correct.

Q And that occurred post-arrest in June?

A Correct.

Q And there was a question about the Defendant's face being on the news. Is that right?

A Correct.

Q But we see in Government's Exhibit 2, the Defendant has what kind of a hairstyle?

A He has a dreadlocks.

Q And what about how his appearance is in court today?

A He doesn't -- he does not have dreadlocks.

Q Has he changed his appearance since his arrest?

A Yes.

Q And has he changed his appearance since his face was shown on TV?
A Yes.
Q Now, there was a question about essentially the State crimes being the same as the Federal crimes, but there is a difference. Is that correct?
A Correct.
Q The State crimes have two misdemeanor official oppressions and one sexual assault, right?
A Correct.
Q And the Federal statute for sex crimes are more expansive than State sexual assault crimes. Is that correct?
A Correct.
Q And there have been more victims that have come forward?
A Correct.
Q Has the State charged him with tampering or the Feds?
A The Feds.
Q For tampering with witnesses?
A Correct.
Q And have the States -- has the State charged him with a 924(c) gun charge, or is that a Federal crime?
A It's a Federal crime.
Q And so, at this point, is it that the investigation has

been primarily taken over by the FBI?
A Correct.
Q And that's why there's been additional charges that haven't been filed and investigated on the State side at this point.
A Correct.
MS. SAUNDERS: I'll pass the witness.
THE COURT: Anything further, Mr. Austin?
MR. AUSTIN: No, Judge.
THE COURT: Okay. Agent Williams, you may step down from the proverbial witness stand.
Thank you very much.
(Witness steps down.)
THE COURT: Any further evidence or testimony from the Government?
MS. SAUNDERS: No, Your Honor.
THE COURT: Any evidence, testimony from the Defendant, Mr. Austin?
MR. AUSTIN: Yes, Your Honor. I do have Rodney Ellis, Mr. Ellis' father. He's prepared to testify.
I see the time is getting a little late. It's almost 12:00 o'clock, and I do have a sentencing at around 1:00. It's up to you, Your Honor.
THE COURT: (Indiscernible).
MR. AUSTIN: I can put him on or I can proffer.

THE COURT: I'm here as long as you all want, so.

MR. AUSTIN: No, but the problem is I can't be here too much longer. So, I'll proffer if the Court does not mind.

THE COURT: Whatever you -- whatever you want. I'm not going to tell you how to try your case.

RODNEY ELLIS - DIRECT BY PROFFER

BY MR. AUSTIN: All right. So, for purposes of the hearing, I think you can see his family is in the background, Your Honor. If Mr. Ellis would be called to testify in -- roughly about his bond conditions. First and foremost, the family is aware of these State charges. The family has posted numerous bonds on his behalf.

Everyone here in court has been traveling to and from Louisiana to all of his court appearances, everyone that you can see behind me on the Court camera. If you all could raise your hand, please.

Additionally, he would testify that Mr. Ellis would be allowed to stay with them, and they would act as sureties or third-party custodians for the Court. They have indicated that if the Court allows it, he can work, and they would abide by any other conditions that the Court would set.

Additionally, let me just -- they were present when he was arrested in court. They were all there, and

they have known about the charges since the beginning. They also mentioned that he's already on ankle monitoring, and that he has been in compliance with his current State Court bond obligations.

And so, if the Court has any questions for Mr. Ellis, he's perfectly glad to answer. If they want to do Cross-examination, he's perfectly willing to do that, Your Honor.

THE COURT: Do you have any questions, Ms. Saunders?

MS. SAUNDERS: No, Your Honor.

THE COURT: Okay. Anything further, Mr. Austin?

MR. AUSTIN: No. I think -- I think that is it in terms of presenting some evidence on this -- on the -- under this defense's obligation, Your Honor.

THE COURT: Okay. Let's turn to argument. Let me start off. Is this a presumption case?

MS. SAUNDERS: Yes, Your Honor.

THE COURT: For what reason?

CLOSING ARGUMENTS

BY MS. SAUNDERS: Under 31.42(e)(3)(B), it's a rebuttable presumption of dangerousness and risk of flight because of the 924(c) use of a firearm during a crime of violence. He's got those charges that he's been indicted on, so that is the basis for the rebuttable presumption.

THE COURT: Okay. Do you think that presumption is the merit?

MS. SAUNDERS: No, Your Honor.

THE COURT: Okay. Tell me why you think detention -- no, let's start off with Mr. Austin, just tell me what the presumption has been.

MR. AUSTIN: Certainly, in terms of the risk of flight, Your Honor, which is a lower standard than, I guess, a danger to community, he has indicated throughout the course of this investigation, since his arrest, that he can be trusted to come and go to court. Indeed, there was testimony by the agent that he was arrested at court and that he has been on house arrest.

We presented evidence that the family is here and able to monitor him and has been monitoring him and has made sure that he is able to come and go to court. The family travels together. So, there has been no allegations that he is not coming to court. The charges are roughly the same.

And so, in terms of the risk of flight, they haven't presented any evidence that suggests he is an actual risk of flight with these charges. And so, in terms of the risk of flight argument, I believe we have presented sufficient evidence to rebut that presumption, starting with he was arrested at court appearing like he was supposed to.

THE COURT: Okay. And by the way, if the

Government is seeking detention both on risk of flight and endangering the community, or one or the other?

MS. SAUNDERS: Both of them, Your Honor.

THE COURT: Okay. Tell me, Ms. Saunders, why is detention appropriate in this case?

MS. SAUNDERS: Your Honor, for a number of reasons, not just the presumption case, but also -- it's a crime of violence with a max term of 10 years or more under 31.42(f)(1)(A), (f)(1)(B), felony with a max term of life. (f)(1)(E), it's a gun case. Obviously, the risk of flight. 31.42(f)(2)(B), serious risk of obstruction of justice and witness tampering. There's a number of reasons as the basis for detention.

Now, I'll start with in terms of the risk of flight. Purely core attendance isn't the sole indicator about whether or not a person has a flight risk. And I would like to distinguish the State Court cases are apples to oranges with what he's facing now with the Feds.

He had two misdemeanors and one felony where the maximum amount that he was facing in State Court was 20 years. He had a couple of court appearances, but it was without him first violating those court appearances because he didn't tell anybody the simple instruction, which was stay in Harris County. He didn't ask to leave. He violated it first. His bond was revoked. His bond was raised, and

then he's been in compliance since that happened in late August. But that was on a misdemeanor -- two misdemeanors and one felony, again, with the cap being 20 years.

Here, we have 20 counts addressing eight victims where now he's facing a maximum sentence of life and is guidelining at a life sentence range. And so, what he was purely coming to court for at the State side is vastly different now from what he's facing on the Federal side.

And so, I understand that it was not the most egregious violation, his noncompliance with his initial bond violation, but it clearly is not the only reflection of this Defendant's lack of compliance with following with simple basic instructions, which the evidence has been provided for the last 10 years from his job dating back to 2014 where he gets in trouble over and over, is suspended, is terminated at his job for, again, even not following some of the most basic of instructions, which include locking a jail cell. That was the basis of his first termination, again, along with allegations of having sexual misconduct with the inmates that he was supervising.

So, risk of flight, I understand that he has come a couple of times to his Harris County settings, but he -- it has not been without the flaws and the Court having to already admonish him. And if they're saying that, yeah, those Harris County charges were serious, he sure didn't

take them serious before he went -- and went to Louisiana without asking for permission first.

So, what he is facing here is drastically different in terms of the range of punishment, and that lack of compliance is reflective about his ignorance and not will -- unwillingness to follow even the most basic instructions.

Now, in terms of his dangerousness to the community and the other, you know, the obstruction of justice witness tampering, you know, the other factors that we're looking at when the Court has to take this into consideration, obviously, the nature and the circumstances of the offense that's charged.

Agent Williams testified that even though there's eight victims that are named in the Indictment, because this investigation is so huge, they've already been able to confirm an additional 13 that just weren't presented in time for this Indictment and upwards to an additional 20 from there.

And why that becomes alarming that the Court should carefully take that into consideration is that we know that the methods of investigation and the way that these crimes were committed were through these financial transactions where on Zelle, a person puts their phone number and pays another person with the Defendant's phone number. The testimony was also that this Defendant

subsequently texted some of these victims.

So, there's a real fear in terms of witness tampering, which he has been charged with in this case, and continued obstruction of justice or witness threats or intimidation because he has these victims, not only their phone numbers through the financial transactions, but the testimony is that several of these victims describe the Defendant photographing their driver's licenses, knowing their address, knowing their personal identifying information.

And so, if the Defendant is on bond, merely confining him to house arrest or putting him on a GPS monitor is not going to limit his ability to reach out to these additional victims and try to, you know, clean up the paper trail or tell them to not participate because there's also been testimony that these victims have been fearful because the Defendant has represented himself in a law enforcement capacity. They have been fearful to come forward with this information based on a possible retaliation of this Defendant based on the position of authority that he was in that he placed himself in.

The weight of the evidence is overwhelming, there are eight victims where the scheme and the scope of what they're saying was done to them is a very consistent pattern. How he would meet them alone at night. After

hours, it was dark. There's text message communications that the Defendant actually showed to HPD where he was on the Sniffies app communicating with Victim 1. There's the Tesla Chase video that's been documented. There's another audio recording that the victims recorded where the Defendant was setting the terms of the payment. The Defendant driving victims to ATM machines, and we're seeing the cash withdrawals, the Zelle transactions, the Cash App transactions.

So, even though there may not be an eyewitness that was occurred in all of these instances, that, again, goes to the scope of how this Defendant can get away with such conduct for such a long period of time because he did it so discreetly.

This is exactly the way he does. He puts himself in a position of authority and perpetrates crimes against people because he does it in a discreet capacity and in a way that he can get victims to not disclose the conduct because of the crimes that he's engaging in.

You know, in fact, again, corroborating what these victims are saying, which is he would take their driver's license. When this Defendant was arrested, the victim's driver's license was found on him with the $20 cash, with a gun, which has all been consistently described by these victims.

So, the weight of the evidence is overwhelming. The nature and the circumstances regarding the safety of the community that this Defendant has placed everybody in is overwhelming and requires attention.

Obviously, the Defendant's history and the characteristics, including ties to the community. He doesn't have any ties to this community. The only ties are this criminal -- these criminal cases, and it was just a second degree in a misdemeanor at the State side.

Now, he is facing life sentences, and we anticipate could be guidelining at that range as well. So, there are so much more now at stake for him, and he does not have ties to this community now but for these criminal charges.

Additionally, he was fired from his job in Louisiana, again, for noncompliance. He was placed on leave at the Parks and Rec, again, for noncompliance, one of those being having a weapon while on duty, which he was not supposed to have.

And it was just overwhelmingly, abundantly clear that based on the weight of the evidence, the way in which this Defendant over a 10 year period of time has consistently violated very basic standard rules of procedure, he cannot comply with these bond conditions, and there's no condition that can guarantee the safety of the

community because GPS records were done on his truck, but because he is, you know, in the job -- scope of his job capacity, he was allowed to go to Cullen Park.

You know, they weren't able to catch him in the act of perpetrating crimes against these people, but there have been GPS monitors that have been placed on him. Although he's under home confinement, again, the real concern is that there is no condition that can be imposed that place -- that keeps the community and these victims safe from him. The same victims that are fearful of disclosing fully this information because this Defendant has been out on bond, has their personal identifying information, has previously texted some of these individuals, and has, in fact, been charged with tampering with witnesses.

And so, for these reasons, there is no condition that can be imposed. We don't feel that just because he's been appearing in court, that does not meet the burden of they would need to rebut the presumption of serious risk of flight, and I've obviously distinguished the State and Federal side. And, again, the dangerousness to the community, he is best served in custody, and that is absolutely the position we would take.

THE COURT: Are you aware of any criminal activity that he was engaged in since the amended bond conditions in

August of 2024?

MS. SAUNDERS: No. Again, there's that one -- that one violation report and I was being candid with the Court in terms of what I suspect happened with that violation. I have not been able to get confirmation from that on the State side.

So, there is possible that there's more information regarding that. I just haven't been able to verify it at this point. So, it is listed, but I can't -- I cannot -- I can't confirm or deny whether or not that's accurate.

MR. AUSTIN: Do you think there's more --

THE COURT: (Indiscernible).

MR. AUSTIN: That's what he is asking.

THE COURT: Hello. You guys can argue amongst yourselves later on. I don't care. I just -- let me ask some questions.

I guess, my question is this: He was on a GPS monitor in August of 2024 till today -- or till he was arrested. No criminal -- your allegation is he’s a danger to the community (indiscernible) for the past three months.

MS. SAUNDERS: It cut out a little bit, but I think -- were you asking if he has done anything illegal?

THE COURT: Correct.

MS. SAUNDERS: No. Nothing bad in terms of new

criminal offenses, no. Not that we are aware of.

THE COURT: Okay. All right. Mr. Austin, your argument.

MR. AUSTIN: Thank you, Judge.

CLOSING ARGUMENTS

BY MR. AUSTIN: I would just start with he is in Louisiana, and the nature of these crimes, it is -- it's clear to me is based on his position as a Park Ranger. That position is no longer. The way the statute reads, you don't have to be a member of the charging community, meaning ties to the community. He has sufficient ties to community. Family is here. That has been unrebutted.

The fact that he is a serious risk of flight has not actually -- there's no -- there has been no evidence presented towards that. I think in terms of the victims in this case, first and foremost, when the authorities arrested him, it sounded to me what I heard was he was cooperating with them. He was offering them his cell phone data. They probably confiscated his cell phone. We didn't think to ask.

But based on the idea that they're going to -- that they have argued, they were able to get these text messages and all these Sniffy messages and things like that, they have his phone. And they -- the testimony was that he showed them himself. So, he’s actually -- certainly

compliant with law enforcement or authority in that way.

I understand he has this violation. I don't know if he told the lawyer, and the lawyer failed to notify the Court or not. But the conditions have been adjusted. He is on house arrest, and he is not in the Houston community. So, the access that he once had to allegedly commit these crimes has been dissipated.

The other part of this that we heard was that he may or may not have been investigated since April and nothing was done. And so, I don't know how the Government now argues, well, we were so fearful for him. We had these allegations, but we didn't do anything about it. Or they were investigating him, and maybe they weren't credible threats or allegations, whoever did the investigation.

But the point is he has been removed from the opportunity to present a danger to the Houston community that is -- that are the alleged victims and based on his position of authority, which is what he's charged with. The case is a presumption because the Government charged a 924(c). We can't get around that.

Whether a 924(c) should be actually charged is maybe a different question. We'd also go to weight of the evidence. They seem pretty strong on that. I assume they have plenty of investigations like this where, you know, you have police officers and other people that are charged with

having a gun and using their position of authority, but we've also heard very clearly he had no authority. So, that's something that can be litigated later on down the line.

In terms of the weight of the evidence, though, that is a -- that is a factor the Court considers. I don't dispute that in any way. I hear that the Government is certainly confident in their ability in this case and the merits of the case. I'm not suggesting anything otherwise. I am suggesting that he will come to court. He has exhibited or demonstrated an ability to come to court. They made an issue about his face being plastered on the TV or on the news, and they said, well, his hair is different. But his face hasn't changed.

I looked this morning. It's the same face, same guy in orange jumpsuit. There's another picture with him and his lawyer. It's all on the news. So. if anybody knows who he is, they can say, hey, that's the guy. Where is he going? He is not going to be able to run anywhere. He has no -- there's been no indication that he won't come to court.

The family is here to support him, which is a further indication to the Court that there are other people that would be responsible for him, which is what community ties are. And so, he has sufficient community ties in

Louisiana, which is where he's living, and he has at least four people in court presently to attest to that fact that he has sufficient community ties.

And so, I think there are conditions. We're not asking the Court to relax any conditions. I think stringent conditions are appropriate based on the allegations, at least with one or two of these victims. He won't be in contact with them. I believe the authorities have his phone, and so there's no way of contacting them, Your Honor.

THE COURT: Anything further, Mr. Austin?

MR. AUSTIN: No, Your Honor. Thank you.

THE COURT: Ms. Saunders, you have the last chance to add anything additional you think should be raised.

MS. SAUNDERS: Yes, Your Honor. Just a couple of points to highlight in that.

REBUTTAL ARGUMENTS

BY MS. SAUNDERS: The testimony was that Parks and Rec may have had some tipsters that began possibly in April that -- okay.

THE COURT: I got -- I got that.

MS. SAUNDERS: Perfect. All right. Thank you, Judge. In terms of the actual case investigation with FBI, did not begin at that point.

And, again, in terms of, you know, the ties and his appearance to court and the Harris County versus Federal

offices, those are -- those are vastly different.

In terms of the gun case and the weight of evidence, since I don't think I touched much on that, the Indictments for the 924(c) charges, that was in response to the testimony that the Defendant pointed, actually, guns at the -- at two victims. One of them actually didn't think he had authority to do what he was doing and got into a physical altercation with him, and the Defendant utilized his weapon and pointed it at him in order to maintain compliance.

And then, obviously, the weight of the evidence corroborates that when that that final Victim 1, but the final victim in terms of the timeline reported to HPD and HPD came out. There, in fact, was the firearm that was found on the Defendant, and, obviously, we have the firearm allegation of him being in possession of it previously in the scope of his employment.

So, that 924(c) charge being the basis of the detention and the presumption is corroborated by the weight of the evidence. And so, obviously, that in conjunction with what I said previously should merit his detention.

THE COURT: Okay. Well, let me ask you all this. I want to be very brunt. I'm sort of torn here, right? Because on one hand, since you all know detention is (indiscernible). That said, obviously the allegations would

have (indiscernible) the Defendant use his (indiscernible) authority to violate and take advantage of people who believe they had no choice but to follow his unlawful demands.

And so, simply because someone is charged with a crime that is heinous, reprehensible, disgraceful, whatever adjective you want to put on it, doesn't necessarily mean that person should be held (indiscernible). The question is this very format is: Are there any conditions or combinations of conditions I could impose that would be either the risk of (indiscernible), which means, you all know (indiscernible) for those -- for the risk of flight (indiscernible) preponderance of the evidence and/or danger to community (indiscernible) well, difficult standard.

I guess, on the risk of flight, Ms. Saunders, where do you think he is going to go?

MS. SAUNDERS: Well, part of the --

THE COURT: (Indiscernible) where you're worried that he is going to -- he is going to take off, go to a foreign country. He clearly doesn't have the financial resources to hire a private plane (indiscernible) the ankle monitor applies on that especially (indiscernible) got his family there (indiscernible) ankle monitor is (indiscernible) and the release of about three to four months, it seems like he has fully complied with that,

hasn’t missed any court appearances, and there's no reported violations of the detention requirement (indiscernible).

MS. SAUNDERS: Well, if this is again -- it's a couple of factors that are -- to be taken into consideration. One, his appearance for Harris County were under very different circumstances, and that it was much more minimal than what he is facing now. So, there's the risk.

Now, in terms of actually appearing for court, one factor that I think was highlighted in the pre-trial services report and then also came out during the testimony was the Defendant's history of mental health issues and self-harm.

I believe in the pre-trial services report, it reported that he had -- he hadn't been diagnosed with anything, but he attempted to be evaluated by a professional. He was not because he fell through. He attempted suicide by overdose. He was taken to the hospital, treated, and subsequently released.

There was the testimony about his mental health issues through his divorce and weapons they needed to be confiscated and him being committed during that time frame. So, the fear is that, obviously, when there are troubling times in his life compared with the mental health issues, that that is when he, you know, goes to these self-harming

issues.

And so, now, that he's facing very different charges, is he going to appear here? Will he self-harm? I can't tell you that he's going to flee to Mexico. You know, I don't know that he has ties to Mexico, but that answer isn't as clean-cut because we have a lot of factors, which is that what he is facing here is very different, and he has a history of mental health issues. And, obviously, we saw initially in Harris County, he didn't comply with the simple instructions. And we've seen that, again, through his past 10 years' worth of employment history, he doesn't follow basic instructions.

And so, that trajectory then, we can reasonably make the leap that he will not continue to be in compliance because the time frame that he has been in compliance has just been a short time frame over the past couple of months since he got a pretty hard hit by being revoked and his bond being raised and having to put more money down. That was, you know, a big thump on the head by the State Court, and that was under even lesser circumstances.

So, there are a variety of factors that the Court needs to take into consideration about will this Defendant continue to appear for these settings?

(Pause in the proceedings)

THE COURT: Mr. Austin, how do I get around the

fact that he violated his bond condition? Like, that is troubling me, right? I'm just -- I've been sitting here, but for that fact.

MR. AUSTIN: Well, I think the first part is he turned himself in when the bond was violated. He turned himself in.

THE COURT: How do I be confident that he is going to follow any conditions that I impose?

MR. AUSTIN: Well --

THE COURT: (Indiscernible)?

MR. AUSTIN: Certainly. I think when he was notified, the bond was violated, he turned himself in, is an indication he is trying to comply with the instructions of the Court. I don't know why he was violated. I don't know if he told his lawyer, and the lawyer said you could go. I'll file something. I don't know the answer to that.

I got the pre-trial report right as we started. But what I do know is more money was paid, and he was continuing to comply with the Court -- the Court conditions, and it was changed to Louisiana, which indicated to me there was a real need for him to be in Louisiana with his family.

So, I understand he was violated, but I also understand he turned himself in when he was told that there was a violation. And there -- and there's no indication that he didn't do that, and there's no indication that he

would not come to court.

I understand the Government's position is now that we've got involved, the stakes are now higher because we don't think the State case is strong enough. I get it. Or sufficiently grave enough. And so, the Federal Government has now stepped in. That's their prerogative.

That doesn't change the allegations. The allegations are the same. Everybody knows what the core fundamental allegations are, whether they classify it as a misdemeanor or not.

By the way, without the 924(c), we wouldn't be looking at anything close to a life sentence. The Count 1 without the 924(c) allegation is a zero to one count or a zero to 10 count. So, there are two ways that that can be violated. The 924(c) is supposed to be a crime of violence, and so that's what ratchets up this case. That's the difference.

It's not any different allegations. They're saying, well, we're going to charge you with the gun. He already knew there was a gun involved in this case because that is -- the nexus of this is the State allegations. There's no new allegations. There's just repeated allegations under a different form.

And so, he's been coming to court. I think there are conditions that will assure he will continue to come to

court, whether it's a Federal Court or a State Court. The family is here. You can have an unsecured bond. They've already paid a 60,000 then a $70,000 bond. Everybody's invested in his continued compliance with the law.

He has no criminal history as well. We understand the Government dug deep into his personnel file. They got his divorce records. I don't know -- frankly, I'm not going to get into what people go through in divorce. I don't know how much of that is malicious. I don't know how much of that is true. But if the Court feels that he needs mental health evaluation, he can get evaluated as a part of pre-trial services. And he can get a job or anything else the Court feels is a necessary component of a condition of release.

But the Government has not shown that he is a flight risk, certainly not a serious flight risk.

MS. SAUNDERS: Your Honor, I'm so sorry to interject, but can I -- may I actually make one correction in terms of the life range? It is not just --

THE COURT: Go ahead.

MS. SAUNDERS: -- it's not based on the 924(c) charge that puts him at life. If you'll see, for example, in Count 5, the deprivation of rights under color of law, there are certain enhancements, like, in Count 5, for example, but this is one of many.

It says in violations of Section 18 USC Section 242 and 250(a), and (b)(1). What that is is that there's an enhancement for -- by an example. This act included kidnapping, aggravated sexual abuse, and attempted aggravated sexual abuse. So, by nature of him blocking in these people's vehicles and restraining their liberty, that is the violent crime of the kidnapping that underlies all of these offenses, and then, obviously, the sex crimes that were in conjunction with this.

So, there are a variety of counts where there are enhanced punishment ranges under the color of law charges because of the crime of violence also being the kidnapping, sexual abuse, things of that nature, and that's on various counts in the Indictment. So, I just wanted to distinguish that, Your Honor.

THE COURT: Gotcha. Okay. Let me take a moment. I want to collect my thoughts here. So, let's go off the Record for a couple of minutes. Thank you.

(Recess taken from 12:18 p.m. to 12:24 p.m.)

THE COURT: Okay. Let's go back on the Record. And thank you very much for your patience.

COURT'S RULING

BY THE COURT: First and foremost, I do want to thank both Counsels for the Government and the Defendant for your presentations today. I greatly appreciate it. Well

done.

Obviously, we're here today on the Government's request to detain the Defendant pending the trial of this. I mean, considering that request as I mentioned briefly before, but I think it's important to put on the Record to make sure everyone fully understands.

I've got about several general principles. First and foremost, Mr. Ellis is entitled at all times to a presumption of innocence, and nothing that takes place in this hearing today or that I set forth in any written Order that I issue is intended -- or should be construed to affect that presumption.

Rather, the sole purpose of this hearing is simply to determine whether notwithstanding the presumption of innocence, Mr. Ellis should be held in custody pending the trial of this case. The other general principle we all need to keep in mind is the Bail Reform Act. That is the statute that governs pre-trial detention, and as I mentioned before, pre-trial detention is an exceptional step.

Under the Act, a Defendant must be released prior to trial whether he or she is a risk of flight or danger to community, and there are no conditions or combination of conditions that I should impose to alleviate that threat. And I should also point out that the Act requires that I impose the least restrictive conditions.

So, that's sort of the standard by which we have to look at -- you talked about this case and the presumption case, I think that the Defendant has unquestionably met the presumption. So then the question becomes, okay, should the Defendant be detained? And there are two different standards. On the risk of flight, the Government has the obligation to show by a preponderance of the evidence, just a little more than not, that there are no conditions or combination of conditions that will reasonably assure the Defendant's presence as required.

On the danger to community is actually a higher burden. The Government has to show that the Defendant in this case, Mr. Ellis, has to show by clear and convincing evidence that there are no conditions or combination of conditions that will reasonably assure the safety of the community (indiscernible).

As you all know, the statute specifically talks about the nature and circumstances of the offense charged, we talked about that heinous allegations of abusing trust. We talked about the weight of the evidence -- I think the weight is pretty strong. We talked about the (indiscernible), the Government’s standard (indiscernible). Before these crimes, Mr. Ellis is 34 years old and had no criminal history, none at all.

And then, of course, we have to look under the

statute at the nature and seriousness of the danger (indiscernible) community that will be posed by the persons released, that obviously applies to the danger to the community piece, as opposed to the (indiscernible).

Let me start on the danger to the community. Look, the standard is high. Candidly, I think there are conditions that I could impose to alleviate the risk to the community. As has been pointed outm the alleged crimes being incurred were when Mr. Ellis was an Urban Park Ranger, had the -- under the guise, under the color of State law, that he had this official power and that he allegedly abuse that. And I just have no reason to believe that if he (indiscernible). Again, I don't have -- I just don't believe the Government has met its burden on the danger to community.

(Indiscernible) where this case turns, and make no bones about it. I am torn. As you all know, I do not like detaining Defendants prior to trial. The Bail Reform Act says it should be the exception, rather than the rule. I look for ways to release Defendants pending trial, give them a chance, as I tell every Defendant that appears before me (indiscernible) release. I say, hey, you got to follow the terms of the condition to a T. If you don't you're going back to the (indiscernible).

Look, I understand he has got a family.

Obviously, very good family. I understand they appeared since August. That he has followed the terms of the release to a T. I'm not aware of any GPS violations. I'm not aware of any violations to danger to community, legal violations. (Indiscernible) causes me great concern is he unquestionably violated the terms of his release from State Court by going to Louisiana and there is no explanation, no discussion, I have no idea what happened, why, and with that -- those are the components of the evidence.

I think the Government has met its burden to show by a preponderance of the evidence that there are no conditions or combination of conditions that will reasonably assure the Defendant's presence as required. Yes, he had appeared at court proceeding before, but the fact that he violated (indiscernible) the terms of his release on State Court on similar charges is a great concern, and that's just something I can't get over.

So, I'm going to hold Mr. Ellis in custody pending trial of this case. I'll issue a written to that effect later today, but I wanted to explain my reason in great detail so there is no misunderstanding as to it.

With all said and done is there anything else we should address today from the Government?

MS. SAUNDERS: No, Your Honor.

THE COURT: Mr. Austin, on behalf of the

Defendant, Mr. Ellis?

MR. AUSTIN: Not at this time.

THE COURT: Okay. Thank you all very much. Have a good day.

Everyone be safe, and I wish you all the best of luck.

We're off the Record. Thank you.

(Proceedings adjourned at 12:30 p.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability due to the condition of the electronic sound recording of the ZOOM/video/telephonic proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #70848*

*DATE FILED: MAY 20, 2026*